643 So.2d 719 (1994)
STATE of Louisiana in the Interest of A.C.
No. 93-CA-1125.
Supreme Court of Louisiana.
January 27, 1994.
Dissenting and Concurring Opinion March 31, 1994.
Rehearing Granted May 12, 1994.
*721 Ross P. LaDart, Gretna, Richard L. Ducote, New Orleans, for applicant.
Robin M. Shulman, Hon. John M. Mamoulides, Barron C. Burmaster, Joan S. Benge, Andrea P. Janzen, Gretna, Gina M. Puleio, Baton Rouge, Sherry Watters, Janice L. Kazmier, New Orleans, Hon. Randy P. Angelle, Breaux Bridge, Helen J. Popich, Lafayette, for respondent.
Dissenting and Concurring Opinion by Dennis, J., March 31, 1994.
*722 HALL, Justice.[1]
This case calls into question the constitutionality of provisions of the Post-Separation Family Violence Relief Act, LSA-R.S. 9:361 et seq. Specifically, the provisions in question are:
-LSA-R.S. 9:364(D), which prohibits any visitation and contact between a child and a parent found to have sexually abused his or her child until such time, following a hearing, that the court finds that the abusive parent has successfully completed a treatment program for sexual abusers and finds that supervised visitation is in the child's best interest, and requires the court to give greater weight to the testimony of the child's therapist than to any other testimony before it on the issue of visitation; and
-LSA-R.S. 9:367, which assigns all court costs, evaluation fees, attorney fees, and expert witness fees, including all costs of medical and psychological care for the abused child to the "perpetrator" of the family violence.
The juvenile court held that these statutes were unconstitutional, in that LSA-R.S. 9:364(D) deprived the offending parent of parental rights without due process of law and unconstitutionally hindered the offending parent's access to the courts. The court also noted that the statute was a legislative encroachment upon the functions and responsibilities of the judicial branch. In addition, the juvenile court held that LSA-R.S. 9:367's taxing the "perpetrator" of the violence with all costs incurred was both unconstitutionally vague and overbroad. The case is before us on the mother of the abused child's direct appeal, challenging the juvenile court's ruling.
Upon review, we reverse the juvenile court and hold that LSA-R.S. 9:364(D) does not violate the constitutional proscription against deprivations of fundamental liberty interests without due process of law. We also reverse the juvenile court's finding that LSA-R.S. 9:367 is vague and overbroad.
However, we affirm the juvenile court in its pronouncement that LSA-R.S. 9:364(D)'s requirement that a court give "greater weight" to the testimony of the child's treating therapist on issues relating to visitation threatens the separation of powers scheme as established in Article II, § 2 of the Louisiana Constitution of 1974, and is unconstitutional to the extent that it is anything more than a precatory direction to the court.

I.
The minor in the case at bar is one A.C., a female child four years of age, and is the issue of divorced parents Mrs. C and Mr. C. Divorced in 1989, the parents had joint custody over A.C., with her father having visitation rights and Mrs. C having domiciliary parent status.
In 1991, Mrs. C began noticing a pronounced redness of the skin around the child's vaginal area, which seemed to be immediately following a visit to her father. Later that year, the child began to describe incidences of what appeared to be sexual abuse by her father. On July 22, 1992, after the Office of Community Services (OCS) "validated" the allegation, the Jefferson Parish District Attorney's Office filed a "Petition-Child In Need of Care" in Juvenile Court for the Parish of Jefferson. The court found that videotaped testimony of the child, coupled with expert reports and testimony of lay witnesses as to the child's age-inappropriate sexual knowledge and behavior indicated the child's involvement in sexual observation or activity with her father. The juvenile court thus determined that A.C. was a Child In Need of Care as to her father, Mr. C, with written reasons for judgment being signed on December 3, 1992. Five days later, the dispositional hearing gave the mother, Mrs. C, legal and physical custody over the child, with OCS-supervised visitation between the child and her father.
On January 15, 1993, Mrs. C moved to modify the judgment of disposition, invoking LSA-R.S. 9:361-369 as support for prohibition of any visitation between A.C. and her *723 father and as support for requiring Mr. C to pay all costs and fees. The court denied the mother's Motion to Modify the Judgment of Disposition, but took the applicability and constitutionality of LSA-R.S. 9:361 et seq. under advisement. On February 24, Mr. C filed a Third Party Impleader, naming the Attorney-General for the State of Louisiana a third party defendant and alleging the unconstitutionality of LSA-R.S. 9:361 et seq. The juvenile court found that the aforementioned provisions of LSA-R.S. 9:361 et seq. unconstitutionally interfered with Mr. C's due process rights and were unconstitutional infringements on the power of the judiciary. The court further found that LSA-R.S. 9:367 gave no guidance or limit to the assessment of costs, making the statute unconstitutionally vague and overbroad. Finally, the court pointed out the potential "chilling effect" that LSA-R.S. 9:364(D) would have on courts making findings of sexual abuse. The court opined that courts would be reluctant to find abuse knowing that the court's hands would be thereafter statutorily tied, requiring the statute to be stricken.
From this judgment, the mother appealed directly to this court under La. Const. Art. 5, § 5(D).[2] She is supported in this court by OCS and the state, through the Attorney-General.

II.

A.
The statute at issue, LSA-R.S. 9:364(D), was adopted in 1992 as part of a continuing legislative effort to address the growing problem of domestic violence and intra-family child molestation. When a child is sexually molested by a parent, the result is often long-term "devastating" psychological trauma, with the result being that "most children who were sexually abused will be abusive parents." Keating, Children In Incestuous Relationships: The Forgotten Victims, 34 Loyola L.Rev. 111, 122, citing Summit & Kryso, Sexual Abuse of Children: A Clinical Spectrum, 48 Am.J. Orthopsychiatry 237, 247-49 (1978). The effects can continue after termination of custody, as the "pressures (upon the child) will be great in themselves and would be substantially exacerbated by compelled visits." Beckham v. O'Brien, 176 Ga.App. 518, 336 S.E.2d 375, 377 (1985).
The legislative intent to address this problem was set forth in LSA-R.S. 9:361:
The legislature ... finds that the problems of family violence do not necessarily cease when the victimized family is legally separated or divorced. In fact, the violence often escalates, and child custody and visitation become the new forum for the continuation of the abuse. Because current laws relative to child custody and visitation become the new forum for the continuation of the abuse. Because current laws relative to child custody and visitation are based on an assumption that even divorcing parents are in relatively equal positions of power and that such parents act in the child's best interest, these laws often work against the protection of the children and the abused spouse in families with a history of family violence. Consequently, laws designed to act in the children's best interest may actually effect a contrary result due to the unique dynamics of family violence.
Part of this body of law designed to protect the child's interest is LSA-R.S. 9:364(D). It provides, in pertinent part, that
(i)f any court finds that a parent has sexually abused his or her child or children, the court shall prohibit all visitation and contact between the abusive parent and the children, until such time, following a contradictory hearing, that the court finds that the abusive parent has successfully completed a treatment program designed for such sexual abusers, and that supervised visitation is in the child's best interest. Any testimony by a licensed mental health professional with training, experience, and expertise in treating sexual abuse victims, who is the therapist for the *724 abused child, shall be given greater weight by the court than other testimony on issues of visitation.
It mandates that, after a finding that a parent has sexually abused his children, visitation shall be prohibited. This prohibition continues until a contradictory hearing is held on the issue of resumption of visitation. At this hearing, the court is required to find that, before visitation of any nature is allowed again, the offending parent has "successfully completed" a treatment program designed for sexual abusers, and that supervised visitation is in the child's best interest. The statute also provides that the testimony of the child's treating therapist must be given greater weight than any other testimony on issues of visitation.
The juvenile court recognized that the parent-child relationship is a fundamental liberty interest that is entitled to full protection under the Equal Protection and Due Process clauses of both the federal and Louisiana constitutions. The court then found that LSA-R.S. 9:364(D) threatened a parent's due process rights by its preventing a court from considering individual circumstances, creating an unacceptably high risk of erroneous deprivation. Further, it saw the statute as infringing upon a parent's access to court by making a parent's access to court dependent upon expert opinion. Appellee further argues that the statute's effective termination of most visitation rights to the child occurs after a finding of abuse by only a preponderance of the evidence, a standard that, given the importance of the right at stake, is so lax as to create a high risk of erroneous deprivation of the parental liberty interests. It is to these arguments that we must first turn our attention. This requires us to first set out the basic tenets of Procedural Due Process.

B.
Under the Fourteenth Amendment of the U.S. Constitution[3] and Article I, § 2 of the Louisiana Constitution of 1974[4], a citizen is protected against deprivations of life, liberty, or property without "due process of law." The meaning of these provisions is clear:
Persons whose rights may be affected by State action are entitled to be heard, and in order that they may enjoy that right, they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful matter.
In re Adoption of B.G.S., 556 So.2d 545, 549 (La.1990). These protections "come into play only if the private interest asserted is constitutionally cognizable." Id. Once the interest has been shown, "a proper evaluation of the State's process can be made in light of the relative importance of the private and public interests at stake." Id.
The balancing of these factors and the determination of whether or not due process has been satisfied is administered under the three-factor test as espoused by the United States Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and adopted by this court (when interpreting the Louisiana state constitution) in Wilson v. City of New Orleans, 479 So.2d 891 (La.1985) and In re Adoption of B.G.S., 556 So.2d 545 (La.1990). The Mathews test involves evaluation of three (3) separate factors:
first, the private interest that will be affected by the official action;
second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
In re Adoption of B.G.S., supra, at 552.
It is well-established that a parent's interest in a meaningful relationship with his or her children is "manifestly a liberty interest protected by the Fourteenth Amendment's *725 due process guarantee." In re B.G.S., supra, at 549. The status of this right as "fundamental" is not at issue, but whether the right has been effectively and permanently deprived by the mandatory termination of visitation and, if the deprivation is permanent, whether or not the alleged deprivation was procedurally sound are matters at issue.

C.
Appellee claims that LSA-R.S. 9:364(D), as applied, interferes with his Procedural Due Process guarantee, in that his fundamental right to be a parent has been effectively stripped after his being proven by a mere preponderance of the evidence to be a sexual abuser. Appellee contends that the "Child In Need of Care" adjudication determined the existence of sexual abuse via a "bare preponderance" of the evidence, and termination of all contact with the child was the automatic penalty for the finding that the parent had committed sexually abusive acts against the child, as mandated by LSA-R.S. 9:364(D). Appellee contends that the second Mathews factor, the risk of erroneous deprivation, is intolerably high, given the ease of meeting this lax standard of proof before his fundamental rights as a parent are allegedly terminated. Appellee claims that, as his parental rights are of such extreme importance and the deprivation is so sweeping in scope, the burden of proof of the existence of abuse should be harder to satisfy. Appellee draws our attention to Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) as support for a requirement of a clear and convincing standard of proof of abuse in proceedings involving LSA-R.S. 9:364(D). We disagree, as Santosky is readily distinguishable from the case at bar.
Santosky involved a permanent termination of all parental rights, via use of New York's "child neglect" statute, N.Y.Soc.Serv. Law §§ 384-b.4.(D), 384-b.7.(a) (McKinney Supp.1981-1982) (Soc.Serv.Law). This scheme allowed permanent termination of all parental rights in advance of a child's being surrendered to the custody of the State so as to be open for adoption. This termination was allowed upon a finding that "positive, nurturing parent-child relationships no longer exist" and that the child's parents have failed "substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so." Fam.Ct.Act § 614. Proof of these factors was to be made by a "fair preponderance of the evidence" test. Fam.Ct.Act § 622. This was a standard of proof that the United States Supreme Court found wanting.
The Court found that, while the State does have the right to intervene in the parent-child relationship so as to protect the interest of minor children, it cannot trample unfettered over a parent's right to, essentially, act as a parent, as "(t)he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents...." Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). Upon this finding that the state was interfering with this fundamental right, the Court then considered whether or not the interference with the right comported with constitutional notions of Procedural Due Process, as guaranteed by the Fourteenth Amendment of the United States Constitution.
Citing Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979), the Court in Santosky stated that
(t)he function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact-finding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.
This "reflects ... a societal judgment about how the risk of error should be distributed between the litigants." Santosky, supra, 455 U.S. at 755, 102 S.Ct. at 1395. The Court in Santosky went on to say that preponderance of the evidence standards reflect society's "minimal concern with the outcome", and that, due to this lack of concern, the litigants should share equally in the risks. Id. However, as the magnitude of the defendant's interests grows, so should the desire to "exclude as nearly as possible the likelihood of *726 an erroneous judgment". Id., 455 U.S. at 756, 102 S.Ct. at 1396, citing Addington, supra, 441 U.S. at 424, 99 S.Ct. at 1808. As the standard of proof required in a particular case is largely left up to the judiciary to decide, it is up to the courts to balance these interests in order to arrive at a constitutionally-acceptable standard of proof. Santosky, supra, 455 U.S. at 757, 102 S.Ct. at 1396, citing Woodby v. INS, 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966).
The U.S. Supreme Court held that an intermediate "clear and convincing evidence" standard is required when the "individual interests at stake are both particularly important and more substantial than mere loss of money." Santosky, supra. Such interests include "significant deprivations of liberty". Id. One such interest is a parent's interest in the "companionship, care, custody, and management of his or her children". Lassiter v. Dept. of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 2160, 68 L.Ed.2d 640 (1981). Thus, the interest of a parent in an accurate determination of any decisions that will terminate all of his or her parental rights permanently is a "commanding one." Id.
The case before this court, however, involves a temporary suspension of some parental rights. LSA-R.S. 9:364(D) provides for a court-ordered prohibition of contact between the child and the abusive parent "until such time ... that the court finds that the abusive parent has successfully completed a treatment program designed for such sexual abusers, and that supervised visitation is in the child's best interest." The statute clearly provides that the parent can, upon a court's finding that he or she has successfully completed a treatment program, regain a parental relationship with the child. The child is not, as in Santosky, being placed in the permanent custody of the State, in anticipation of adoption by a new set of foster parents.[5]
Appellee also claims that when a parent's rights to custody and unsupervised visitation are removed via LSA-R.S. 9:364(D), the parent is effectively stripped of all aspects of the fundamental rights involved in parenthood. This is incorrect, as custody and visitation are only part of the parcel of parental rights. The change in custody and visitation caused by a court order (even one involving LSA-R.S. 9:364(D)) is "subject to any residual parental rights and responsibilities." LSA-Ch.C. art. 1511. These "residual parental rights" are defined in LSA-Ch.C. art. 116 as
those rights and responsibilities remaining with the parents after the legal transfer of custody of their child, including but not necessarily limited to right of visitation, consent to adoption, right to determine religious affiliation, responsibility of support, and the right of inheritance from the child.
When parental rights are terminated via use of LSA-Ch.C. 1001-1040, the parent loses all of these residual rights, as well as the rights of custody and visitation. In the instant case, LSA-R.S. 9:364(D) permanently removes only the parental rights of custody and unsupervised visitation, and leaves intact the right of supervised visitation (provided the parent successfully completes the treatment program) and all residual rights envisioned in LSA-Ch.C. art. 116. The termination in Santosky, supra, removed all of these rights and, given the greater negative *727 effect on the parent's store of rights, necessarily dictated a higher standard of proof. In the instant case, only certain enumerated rights of the parent are curtailed via use of LSA-R.S. 9:364(D), and some of these curtailed rights are recoverable. Indeed, appellant correctly points out that, if Santosky were held applicable to instances such as this one where custody and visitation are curtailed, every custody hearing would necessarily involve a fundamental right, and would require clear and convincing evidence of parental unfitness in order to make any award of custody adverse to the interest of the parent.[6]
Such a result would ignore the third Mathews factor, that of evaluating the governmental interests involved and determining whether or not they are so high as to justify the current scheme. This governmental interest encompasses the relative cost and practicality of an enhanced burden of proof and the state goals in passing the statutes at bar. The cost of such proceedings for the State will be increased as a result of a higher evidentiary standard. In cases where a child is alleged to be in need of care due to parental sexual abuse, the State must expend more time and resources in meeting a higher evidentiary standard in these proceedings designed to protect a child's best interests. The administrative burden on the State will also be increased. While the State's factfinders are well-equipped to deal with this higher standard (given the courts' experience with other proceedings involving clear and convincing evidentiary standards, such as termination proceedings), cases will take necessarily longer to try, exacerbating the already-excessive backlog of cases in the judicial system.
While the enhanced burden of proof would allow for errors on the side of protecting the interests of the parent in the case of alleged abuse, it would also create a risk of harm to the victim of the alleged abuse. The Court in Santosky was concerned with preponderance of evidence standards reflecting a "minimal concern" on the part of society in the outcome of litigation, but, in this case, the assignment of a preponderance standard by the legislature reflected a pressing concern on the part of the legislature. In the instant case, the legislature has made a determination that the need to protect the child from the often deleterious effects of contact with the abusive parent outweighs the limited loss of rights that the parent will experience. This is reflected in the legislature's "societal judgment" as to where the risk of error should fall by its use of a preponderance standard that errs, if at all, not on the side of punishing the parent, but of protecting the child.[7]
When all these Mathews factors are considered together, the balance tilts in favor of retention of the preponderance of the evidence standard when dealing with temporary parental rights terminations that are limited in scope. It is our opinion that the current preponderance standard sufficiently strikes a balance between the fundamental rights of the father and the State's legitimate concerns with the best interests of the child. Thus, we *728 must dismiss appellee's argument and find that the current standard satisfies the dictates of Procedural Due Process.

III.
The juvenile court was also concerned that LSA-R.S. 9:364(D) denied a parent's access to a court, an additional reason why, in its opinion, LSA-R.S. 9:364(D) was violative of Procedural Due Process. The court explained that, as the access to the court for review of the order that denies visitation is "dependent upon expert opinion and an undefined standard", the legislature has elevated the child's treating therapist to the position of decision-maker on all issues of custody and visitation. It held that this aspect of the statute led to a violation of the offending parent's procedural due process rights. We disagree with this interpretation.

A.
Traditionally, "it has long been recognized that due process necessitates ... that all persons are entitled to their `day in court'". Billman v. Sumrall, 464 So.2d 382, 384 (La. App. 1st Cir.1985). Although this "guarantee of access to the courts is in reality a guarantee of due process," the Louisiana Constitution of 1974 has a specific constitutional provision that governs such matters. Crier v. Whitecloud, 455 So.2d 1279, 1283 (La.App. 4th Cir.), writs granted, 460 So.2d 594 (La.1984), reversed 486 So.2d 713 (La.), affirmed on rehearing, 496 So.2d 305 (La. 1986). La. Const. Art. I, § 22 (1974) provides that
All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.
This right becomes especially important if there has been a "successful invocation of this governmental power by plaintiffs" so as to create "serious problems" to defendants' rights. Boddie v. Connecticut, 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971).
This right of the individual to access to the judicial process is only occasionally subject to legislative interference. Only "where access to the judicial process is not necessary to the exercise of a fundamental constitutional right" is the legislature "free to allocate access to the judicial machinery on any system or classification which is not totally arbitrary." Bazley v. Tortorich, 397 So.2d 475, 485 (La.1981). If there is a fundamental right at stake, then the State must be prepared to demonstrate a "compelling governmental interest before [access] can be regulated." United States v. Kras, 409 U.S. 434, 447, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973). If there is, as demonstrated by the lack of such a state interest, an "absence of a sufficient countervailing justification for the State's action [the denial of access will be] a denial of due process." Boddie, supra, 401 U.S. at 382, 91 S.Ct. at 787. With these precepts in mind, we now turn our attention to the statute at bar.

B.
At the outset, we must reiterate that the statute in question does not create "serious problems" to appellee's fundamental rights, since, as mentioned previously, only certain limited aspects of the privileges and responsibilities of parenting are affected by LSA-R.S. 9:364(D). The effects on the "fundamental right" of parenting are limited in both scope and duration, making any infringement on the right of access to a court of less importance than appellee claims.
Even assuming, arguendo, that there has been a significant deprivation of the fundamental right of parenting by LSA-R.S. 9:364(D), the statute does not, on its face, bar access to the courts. The trial court observed that the statute in question prevents a parent who has been determined to be abusive to petition for a change in visitation rights unless he or she first "successfully completes" a sexual abuse treatment program, as determined by one expert (the child's treating therapist), using an indefinite "standard". We dismiss this observation as incorrect.
As mentioned previously, "(t)he essential guarantee of the Due Process Clause is fundamentally fair process for the individual in the resolution of the factual and legal *729 basis for government actions which deprive him of life, liberty, or property." In re Adoption of B.G.S., supra, at 555. This "fundamentally fair process" requires "some type of neutral and detached decision maker." Wilson v. City of New Orleans, 479 So.2d 891, 901 (La.1985). The presence of "an impartial decision maker is essential" to due process. Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970).
The statute in question states that, after a finding of abuse, all contact by the abusive parent with the child ceases until such time as the parent has "successfully completed a treatment program designed for such abusers." This successful completion is determined at a contradictory hearing, and, at this hearing, the testimony of the child's treating therapist must be given "greater weight" on this and any other issue relating to visitation. In the instant case, the trial court was concerned with the judgment of a therapist being substituted for its own judgment on what was in the child's best interests. The neutrality of this expert is highly questionable given the fact that the expert is in a therapist/client relationship with the victim of the abuse, the child, and, as such, will, in all probability, be "subject to competing ... pressures, and ... can hardly be said to be neutral." In re Adoption of B.G.S., supra, at 555. The therapist, intending to protect his or her client, may be overcautious and repeatedly state that the parent has failed to, in his or her opinion, complete the treatment program. Even if the abusive parent could not show that there was "special prejudice in his particular case, the situation in which (a decisionmaker) occupies two inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process." Wilson v. City of New Orleans, supra, at 901-902. See also Ward v. Village of Monroeville, Ohio, 409 U.S. 57, 61, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972). For these reasons, interpreting the statute to effectively place the access to courts or the entire "decision in the hands of a potentially adverse decision maker" (such as the child's therapist) would serve to render the statute violative of one of "the most basic principles of due process under both our state and federal constitutions," this being the requirement for a neutral decisionmaker. Id., at 556.
When a court finds a reasonable way to do so, "it must construe a statute so as to preserve its constitutionality." Moore v. Roemer, 567 So.2d 75, 78 (La.1990). A constitutional construction of this statute requires this court to acknowledge that, in reality, the actual role of the child's treating therapist in the proceedings to modify the order of disposition is quite limited. The child's treating therapist serves to advise and assist the trier of fact in determining what is in the child's best interest. As Article 702 of the Louisiana Code of Evidence provides, the therapist is to be treated just like any other expert whose testimony "will assist the trier of fact to ... determine a fact in issue." One facet of this assistance is in the child's therapist giving his or her expert opinion on whether or not the once-abusive parent has successfully completed the sexual abuse treatment program. The therapist does not decide whether or not supervised visitation is in the child's best interests, since the statute clearly leaves that decision in the court's hands. LSA-R.S. 9:364(D) expressly provides that contact is prohibited until "the court finds that the abusive parent has successfully completed a treatment program designed for such sexual abusers, and that supervised visitation is in the child's best interest." (Emphasis added.)
Thus, it is abundantly clear that the statute itself specifically leaves the decision in the hands of the classic model of a neutral decision makerthe court. Nowhere in LSA-R.S. 9:364(D) is it evident that the therapist determines whether or not the parent has access to the courts, as the statute provides that the therapist is merely there to serve an expert's role in relating to the court his or her opinion on the parent's successful completion of a treatment program. Given this court's duty to, whenever possible, construe statutes so as to allow them to be constitutional, we shall not read into the statute a requirement that the child's treating therapist have a veto power over a parent's access to a court when such an interpretation is not apparent from the statute itself. Thus, we disagree with and reverse the juvenile *730 court in its determination that the statute predicates access to courts upon an expert's opinion.

IV.

A.
The juvenile court was concerned with the fact that LSA-R.S. 9:361 et seq. interfered with a power that had been conferred upon the court by La.Ch.C. art. 683, said power being the power to
impose the least restrictive disposition which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society.
The juvenile court was disturbed by the statute's removal of this discretionary power, and its replacement of it by a mandatory disposition scheme that did not give much credence to individual circumstances. This change was made even more perplexing to the trial court by LSA-R.S. 9:368's express statement that LSA-R.S. 9:361 et seq. would "in no way affect the remedies set forth in... the Children's Code". The trial court felt that the mandatory termination of all but unsupervised visitation was a conflict with the discretionary power that the Children's Code conferred upon the courts of this state, despite LSA-R.S. 9:368's statement to the contrary. Although, at first glance, the trial court's conclusion that the two statutory schemes seem to irreconcilably conflict with each other, it is possible to interpret these statutes in a harmonious fashion.

B.
La.Civ.Code art. 13 provides that "[l]aws on the same subject matter must be interpreted in reference to each other." When dealing with conflicting statutes on the same subject matter, this article makes it this court's "duty to harmonize and reconcile the acts if possible". State v. St. Julian, 221 La. 1018, 61 So.2d 464, 465 (1952). La.Ch.C. art. 683 deals with dispositional alternatives available to a court when it finds that a child is in need of care due to its being abused or neglected. See La.Ch.C. art. 606(A). LSA-R.S. 9:361 et seq. deals with children who are victimized by a particular form of abuse, to wit, sexual abuse. Both schemes deal with abuse, but, in the instant case, LSA-R.S. 9:364(D) deals with a more specific form of abuse, child sexual abuse. In cases involving sexual abuse, the court is not allowed to exercise its discretion, as it is given limited dispositional alternatives.[8]
It is a well-settled proposition that "[i]n the interpretation of ... statutes, the specific controls the general." Mixon v. St. Paul Fire and Marine Ins. Co., 147 La. 302, 84 So. 790, 791 (1920). In the instant case, the later-enacted LSA-R.S. 9:364(D) specifically governs cases involving child sexual abuse, whereas La.Ch.C. art. 683 deals with cases involving abuse in general. Thus, LSA-R.S. 9:364(D) must control, as it is the later and more specific statute dealing with child sexual abuse.
This resolution of the conflict is also supported by the clearly-expressed intent of the legislature (as found in the "Legislative Findings" preamble to LSA-R.S. 9:361 et seq.). The intent was to supersede "current laws ... [that] often work against the protection of the children ... in families with a history of family violence." As there is conflict between the two statutes' dispositional schemes, "the one which expresses the intent of the law-makers should control." St. *731 Julian, supra, 61 So.2d at 466. The intent was to remove even the possibility of further abuse of the child at the hands of the parent due to perceived failures of existing laws (including the Children's Code), and LSA-R.S. 9:364(D) ensures that this intent will be respected. Therefore, in cases involving child sexual abuse, we hold that LSA-R.S. 9:364(D) should control, prohibiting contact between the abusive parent and the child until the court finds, first, that the parent has successfully completed a sexual abuse treatment program and, finally, that supervised visitation is in the best interests of the child.

V.

A.
As mentioned previously, LSA-R.S. 9:364(D) provides for, upon a finding of sexual abuse by any court, a prohibition on all contact between the abusive parent and the child. This prohibition continues until a contradictory hearing is held on the issues of successful completion of a sexual abuse treatment program by the parent and on whether or not supervised visitation is in the child's best interest. In this hearing, however, the court is legislatively compelled to assign a certain weight to the testimony of one expert, the child's treating therapist, and this compulsion requires the court to give this testimony greater weight than any other testimony presented to it.
The juvenile court noted these mandates, and was concerned about the absence of guidelines in the statute for what constitutes "successful" treatment of the abusive parent, with the statute instead relying upon "greater weight" being given to the opinion of the child's treating professional. The juvenile court felt that this was a "legislative encroachment on the powers and responsibility of the judiciary." It found the encroachment to arise from the statute's preventing the court from considering individual circumstances, qualifications of therapists, or credibility of witnesses. In determining whether or not this statutory scheme encroaches upon the powers of the judiciary, we must now focus our discussion on what some of these powers are.

B.
Unlike the federal Constitution, which functions from "enumerated powers" to each branch of government, the Louisiana Constitution presumes extensive and complete powers to the state legislature. State ex rel. Guste v. Legislative Budget Committee, 347 So.2d 160, 164 (La.1977). The only limits on this power stem from specific enumerations in the state Constitution:
A general principle of judicial interpretation of a state constitution is that, unlike the federal constitution, a state's constitutions are not grants of power, they are rather limitations on the power of the people exercised through the state legislature. In its exercise of the entire legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit. Thus, to hold legislation invalid under the state constitution, it is necessary to rely upon some particular constitutional provision that limits the power of the legislature to enact the statute assailed.
In re Gulf Oxygen Welder's Supply Profit Sharing Plan and Trust Agreement, 297 So.2d 663, 665 (La.1974). One such provision is the prohibition on violations of the principle of separation of powers, as espoused by the Louisiana Constitution of 1974.
The scheme of separation of powers stems from Article II, which provides that
Section 1. The powers of government of the state are divided into three separate branches: legislative, executive, and judicial.
Section 2. Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others.
La. Const.1974, Art. II, §§ 1 and 2. This section stands for the proposition that "the Constitution is violated only if one branch of government or its members exercises power belonging to either of the others" Guste, supra, at 165. This rule has its origin in a desire for each branch to act as a "check" upon the other and, by so doing, ensure a *732 "balanced" government, as was expressed by the United States Supreme Court in Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935):
The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential coequality. The sound application of a principle that makes one master in his own house precludes him from imposing control in the house of another who is master there. James Wilson, one of the framers of the Constitution and a former justice of this court, said that the independence of each department required that its proceedings `should be free of the remotest influence, direct or indirect, of either of the other two powers.' And Mr. Justice Story in the first volume of his work on the Constitution, citing No. 48 of the Federalist, said that neither of the departments in reference to each other "ought to possess directly or indirectly, an overruling influence in the administration of their respective powers."
Thus, it is clear from the jurisprudence that "no one department (can) unduly interfere with or hinder any other department while the latter is acting or assuming to act within the scope of the particular powers reserved to it." Durrett Hardware & Furniture Co. v. City of Monroe, 199 La. 329, 5 So.2d 911, 914 (1942).
This tenet has particularly strong application to legislative encroachments upon the powers of the judiciary. This Court noted this limitation in State In Interest of Johnson, 475 So.2d 340, 342 (La.1985):
The inherent judicial power may be aided by the legislative and executive branches, but their acts or failures to act cannot destroy, frustrate, or impede the court's inherent constitutional authority.
See also, Hargrave, The Judiciary Article of the Louisiana Constitution of 1974, 37 La. L.Rev. 765, 793-94; Singer Hunter Levine Seeman & Stuart v. Louisiana State Bar Association, 378 So.2d 423, 426 (La.1979); and Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102, 108 (La.1978) (Dennis, J., dissenting from the opinion on original hearing). The problem is, of course, determining the nature and extent of this inherent authority "essential to the survival of the judiciary as an independent branch of government." Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 274 A.2d 193, cert. denied, 402 U.S. 974, 91 S.Ct. 1665, 29 L.Ed.2d 138 (1971).
According to La.C.C.P. art. 191, "(a) court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law." This doctrine of inherent powers confers upon the court "the power [other than those powers expressly enumerated in the constitution and statutes] to do all things reasonably necessary for the exercise of their functions as courts." Konrad v. Jefferson Parish Council, 520 So.2d 393, 397 (La.1988). Another branch cannot, "by denying resources or authority to the court, prevent the courts from carrying out their constitutional responsibilities as an independent branch of government." Konrad, supra, at 397.
First and foremost of these responsibilities is to hear cases and, based on the evidence presented, render judgments. This is evident in the concept of "jurisdiction" as defined by the Code of Civil Procedure. It involves a court hearing and determining an action or proceeding "involving the legal relations of the parties, and [granting] the relief to which they are entitled." La.C.C.P. art. 1. As this Court pronounced in Bastrop State Bank v. Samson Levy, 106 La. 586, 31 So. 164, 165 (1901),
(j)udicial tribunals are established to administer justice between litigants, and the first and most important step to that end is the ascertainment of the truth of the controversies which come before them. It is only when the truth is ascertained that the law can be applied in the just settlement of disputes.
Before a proper result can be reached, certain crucial facts must be established and *733 adjudicated upon as true or false. The determination of fact "is exclusively a judicial function." Mongogna v. O'Dwyer, 204 La. 1030, 16 So.2d 829, 832 (1943). As the Supreme Court of the United States noted in Wingo v. Wedding, 418 U.S. 461, 474, 94 S.Ct. 2842, 2846, 41 L.Ed.2d 879 (1974), "one of the essential elements in the determination of the crucial facts [in a case at bar] is the weighing and appraising of the testimony."
From these authorities, it is apparent that the core function of the judiciary is the administration of justice between litigants. A proper execution of that function requires a court to arrive at the truthfulness of facts presented before it, and courts are vested with certain inherent powers necessary to achieve this function. It follows that one of these inherent powers is the trier of fact's "inherent power and duty to weigh evidence and judge the credibility of a witness," to assign various weights to testimony before the court, and then, based upon these determinations, render a judgment that satisfies justice. State v. Warren, 438 So.2d 1110 (La.1983) (Dennis, J., dissenting.)
It is important that we emphasize that the doctrine of inherent powers is not without limit and should be used reluctantly. As this court stated in Konrad v. Jefferson Parish Council, 520 So.2d 393, 397 (La.1988),
[b]ecause there is some inevitable overlap of the functions, each branch of the government must strive to maintain the separation of powers by not encroaching upon the powers of the others. Consequently, the inherent powers of the judiciary should be used sparingly and only to the extent necessary to preserve judicial independence and integrity.
(Emphasis added.) In the instant case, the legislature is clearly infringing upon the independence of the judiciary in making credibility determinations of witnesses in matters that are properly before the courts. It is important for us to note that this holding in no way limits the right of the legislature to determine what evidence will be presented to the court, but, instead, emphasizes that, once the evidence is properly before the finder of fact, it is clearly within the finder of fact's authority to determine how that piece of evidence will be evaluated for credibility.
Practically speaking, this result also is supported by the prodigious amount of jurisprudence that recognizes the particular expertise which trial courts possess in the field of evaluating credibility of witnesses before it. This court has held that, in the field of testimony, even expert testimony, the trial judge is in a unique position to evaluate credibility of the witnesses as the trial judge is the one who sees and hears the witnesses. Gravity Drainage District No. 1 v. Key, 234 La. 201, 99 So.2d 82, 86 (1958). This court, "particularly on questions depending upon the credibility of the witnesses who testified before the trial judge", has repeatedly recognized this expertise and, during the appeals process, has given trial courts great deference on their credibility determinations. Barnes v. Le Blanc, 207 La. 989, 22 So.2d 404 (1945). See also Dobson v. Louisiana Power and Light Co., 567 So.2d 569 (La. 1990); Ginlee v. Helg, 251 La. 261, 203 So.2d 714 (1967); Kendrick v. Kendrick, 236 La. 34, 106 So.2d 707 (1958). It logically follows that this repeated recognition of the trial court's superior ability to determine credibility of witnesses before it should militate against a legislature's usurpation of this function.
Therefore, it becomes apparent that the juvenile court was correct in its holding that the statute in question dictates to the courts how they are to weigh testimony presented to them. The statute requires (by its use of the word "shall") the court to give "greater weight" to the testimony of a "licensed mental health professional with training, experience, and expertise in treating sexual abuse victims, who is the therapist for the abused child" than to any other evidence before it. It expressly commands the courts to, regardless of the credibility of the child's therapist or the credibility or cumulative effect of any amount of opposing expert testimony, give greater weight to the child's therapist on two issues before the court, successful completion of the program by the offending parent, and whether or not supervised visitation is appropriate for the child. The *734 statute effectively strips the court of an inherent power, the power to adjudicate a fact before it (the offending parent's successful completion of an anti-abuse program), based upon the evidence it considers most believable. Also, the issue of whether visitation is appropriate at all is a dispute within a court's jurisdiction "involving the legal relations of parties" (parent and child) and requires the court to "grant the relief to which they are entitled" (visitation or no visitation). La. C.C.P. art. 1.
As it is a dispute requiring the court to make decisions that affect the rights of the parties, it is clear that the court is vested with whatever inherent powers "necessary for the exercise of its jurisdiction". These powers include the inherent power to assign various weights to evidence it deems credible, no matter what the source. La. C.C.P. art. 191. By its command that the court assign a particular weight to the evidence before it to the exclusion of any other testimony (whether individual or cumulative), the statute is infringing upon this inherent power of the judiciary. As the court stated in State v. County Court of Kanawha County, 138 W.Va. 885, 78 S.E.2d 569, 574 (1953), "the legislature may impose duties, judicial in character, upon the courts, but having once imposed these powers it has no right to control the exercise thereof." The courts are vested, by both constitutional and legislative mandate, to adjudicate what is in the child's best interest by examining testimony presented to them, and, after this grant of jurisdiction, the legislature cannot control the exercise of this power by dictating how various admissible evidence is to be weighed.
Appellant claims that the therapist in this case is equivalent to a "treating physician", whose testimony is "always given greater weight." The appellant draws our attention to several cases where this type of expert testimony was given "greater weight" by this Court, and asks us to analogize this problem to those cases. These cases involved courts, not legislatures, making the decision to afford a particular expert's testimony greater weight than other testimony. For example, in one cited case, Housley v. Cerise, 579 So.2d 973, 980 (La.1991), this Court stated that "the trial court is in the best position to interpret the substance of the witness's testimony in light of his mannerisms and inflection of voice."
Past jurisprudence has not always recognized the great weight that appellant would give to expert testimony. In another case cited by appellants, Johnson v. Ins. Co. of North America, 454 So.2d 1113, 1117 (La. 1984), this court stated that expert opinion, though useful, is not always dispositive, as "[t]he opinion of a physician or other medical expert about disability does not necessarily determine legal disability." Id. If this hesitation about unconditionally embracing medical expert testimony exists in cases involving physical disability, it appears that the same hesitation should apply a fortiori in a case involving evaluation of the different parties' psychological states, where the testimony will be more complex and, by its being psychological in nature, more susceptible to varying opinions of less certainty. See State v. Foret, 628 So.2d 1116 (La.1993).
For the reasons stated above, it is apparent that this statute infringes upon an inherent power of the judiciary. It lends to an unacceptable result under our constitutionally-required doctrine of separation of powers,
as the people have a right to the judgment of those whom they have made judges, and this right the judges cannot surrender ... it cannot be delegated by the judges themselves, nor by anyone else for them.
State v. Noble, 118 Ind. 350, 21 N.E. 244, 249 (1889). It may seem like a small invasion of the judiciary's power, but this Court's "acquiescence to a gradual invasion of the judiciary by the legislature would eventually render the former little more than a judicial staff of the legislature." State v. Clemente, 166 Conn. 501, 353 A.2d 723, 731 (1974). Thus, LSA-R.S. 9:364(D)'s requirement that the testimony of the child's therapist be given "greater weight" on the issue of visitation than any other testimony must be struck as in violation of Article II, § 2 of the Louisiana Constitution of 1974, at least to the extent that it is anything more than a precatory suggestion.

*735 VI.
As we have stricken the provision in LSA-R.S. 9:364(D) ordering courts to give greater weight to the testimony of the child's therapist due to its unconstitutional infringement on the inherent powers of the judiciary, we must now consider whether this stricken part of LSA-R.S. 9:364(D) is separable from the body of LSA-R.S. 9:364(D). The question here is to determine whether or not the remaining portion of the enactment is "independent of the invalid portion and (can) form a complete act within itself." Succession of Lauga, 624 So.2d 1156, 1171 (La.1993). The test for this severability involves examination of whether the legislature would have passed the statute with the offensive portions removed, given the dominant purpose of the enactment. See Lauga, supra; State v. Johnson, 343 So.2d 705 (La.1977); Roy v. Edwards, 294 So.2d 507 (La.1974); and Gaudet v. Economical Super Market, 237 La. 1082, 112 So.2d 720 (1959).
As mentioned previously, the express legislative intent was to correct current laws that, due to the unique dynamics of intra-family violence, "often work against the protection of the children and the abused spouse in families with a history of family violence." The intent is to create a scheme that mandates that a child be protected from the threat of further abuse unless and until the court determines that the abuser has successfully undergone therapy.
This intent will still be satisfied, as the court will still bar all contact until it decides that the parent poses no further risk to the child. The intent is not threatened by a court's independent assigning of evidentiary weights as it sees fit, especially given the trial court's unique expertise in making on-the-scene judgments as to the credibility of witnesses before it. As mentioned previously, extensive jurisprudence recognizes this expertise on the part of a court.
Therefore, this Court finds that the provision of LSA-R.S. 9:364(D) that mandates that the court give "greater weight" to the child's therapist can be severed and the remainder of the Act can be enforced.

VII.

A.
The juvenile court also found that LSA-R.S. 9:367 was unconstitutionally vague and overbroad. The juvenile court was concerned that this statute hamstrung the discretion of the court to control the extent of parental liability for fees incurred, and that this discretion was necessary in light of the fact that many of the parties to these types of proceedings were indigent. LSA-Ch.C. arts. 655, 669, and 685 allow for and provide procedures for courts to determine parental liability for medical care and treatment. These fees' assessment depend upon notice and an opportunity to be heard, and the trial court held that LSA-R.S. 9:367 flies in the face of this by mandatory assessment of any and all fees to a parent with no prior judicial determination of fairness of the fee and whether the parent is indeed liable for it. The court also speculated as to what safeguards there might be to protect a parent from being forced to pay for the abusively expensive and/or frequent treatments, and, deciding that there were none, held the statute to be vague and overbroad. Finally, noting that this scheme could cause greater damage to indigent parents than to affluent ones, the court questioned its constitutionality under an Equal Protection analysis.

B.
At the outset, we can dispose of any Equal Protection arguments, as nowhere was it shown that the appellee is an indigent with standing to assert the unconstitutionality of this statute under wealth discrimination grounds. In order to have standing to raise a constitutional issue, there must be an "injury in fact" to the plaintiff, not the remote threat of injury to him or injury to another class of which he is not a member. See Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); and Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). As appellee had, at no time, been adjudicated as an indigent, he had no standing to raise this claim and it was not properly before the trial judge.

*736 C.
Vagueness and overbreadth are technical terms in constitutional law. They traditionally are used when the statute in question is so all-encompassing that it acts as an impediment to the exercise of free speech. See State v. Greco, 583 So.2d 825 (La.1991); City of Baton Rouge v. Schmieder, 582 So.2d 1266 (La.1991). In the instant case, however, LSA-R.S. 9:367 is challenged as violating the Due Process guarantee that a law present fair notice of consequences for proscribed conduct.
It is well-established that
(u)nder article I, section 2 of the Louisiana Constitution of 1974 and the fourteenth amendment to the United States Constitution, words and phrases used in statutes must not be so vague and indefinite that any penalty prescribed for their violation would be a taking of liberty or property without due process of law.
State v. Jackson, 404 So.2d 952, 953 (La. 1981). The statute must give guidance to the judiciary as to its determinations, as
(a) law fails to meet the requirements of the Due Process clause if it is so vague and standardless that it leaves judges free to decide, without legally fixed criteria, when an individual must suffer the impositions of burdens or forfeiture of rights.
State in Interest of Hunter, 387 So.2d 1086 (La.1980).
In interpreting the constitutionality of a statute, there is a general presumption of constitutionality. See Matter of American Waste and Pollution Control, 588 So.2d 367 (La.1991). In the previous analysis, the United States Supreme Court was concerned with a fundamental right/interest at stake that involved more than a "mere loss of money", creating a potential weakness in this presumption of constitutionality. Santosky, supra, 455 U.S. at 755, 102 S.Ct. at 1395; Board of Directors of Louisiana Recovery District v. All Taxpayers of La., 529 So.2d 384 (La.1988). In the instant analysis, all that is at stake is the imposition of costs and expenses, a matter involving not a fundamental right or liberty interest, but one involving mere pecuniary concerns. Thus, there is a strong presumption of constitutionality in this instance.
When a court finds a reasonable way to do so, "it must construe a statute so as to preserve its constitutionality." Moore v. Roemer, supra; State v. Newton, 328 So.2d 110 (La.1976). Thus, it is incumbent upon this court, if there is a reasonable way to do so, to find a way to interpret LSA-R.S. 9:367 so as to preserve its constitutionality. The means to do so can be obtained from the text of the statute itself.

D.
LSA-R.S. 9:367 provides, in pertinent part, that all court costs, attorney fees, evaluation fees, and expert witness fees incurred in execution of this statutory scheme set forth by LSA-R.S. 9:361 et seq.
shall be paid by the perpetrator of the family violence, including all costs of medical and psychological care for the abused spouse, or for any of the children, necessitated by the family violence.
(Emphasis added.) The juvenile court was concerned that there was no "cap" on this amount, and that there would be no prior judicial determination of fairness of the fee and whether the parent was indeed liable for it. The word "necessitated" in the statute serves to alleviate the trial court's concern that there is no check on the imposition of these costs, as the trial judge has discretion to determine certain costs as not "necessitated" by the violence, due to their frivolity and/or excessiveness.
This interpretation also removes any specter of conflict with the Children's Code. LSA-R.S. 9:368 purports to claim that no remedy enacted in LSA-R.S. 9:361 et seq. "shall in no way affect the remedies set forth in ... the Children's Code." Any denial of judicial discretion to assign costs would be in contravention of certain parts of the Children's Code which specifically vest the court with discretion to assign or waive entirely, in accordance with ability to pay, the imposition of necessary costs and fees.[9] Thus, the use *737 of the word "necessitate" as a check on any threats of vagueness that could be posed by LSA-R.S. 9:367 also furthers the legislative intent of maintaining harmony with the Children's Code.
For these reasons, we hold that the juvenile court erred in finding that LSA-R.S. 9:367 was unconstitutional, and we reverse this holding.

VIII.
In summation, we hold that the provisions of LSA-R.S. 9:364(D), as applied, are not violative of a parent's Due Process rights as guaranteed by La. Const. Art. I, § 2 (1974) and by U.S. Const. Amend. XIV. We find that the application of LSA-R.S. 9:364(D) to cases where sexual abuse is proven by a mere preponderance of the evidence meets the rigors of constitutional Procedural Due Process. We further hold that this statute does not permanently deprive a parent of all of the rights of parent, and, due to the limited nature of this deprivation, does not require the allegations of sexual abuse to be proven by clear and convincing evidence.
Additionally, we hold that this same provision of LSA-R.S. 9:364(D) does not effectively replace an independent tribunal's determination of the best interests of the child with expert determinations of issues before the court, such as a parent's successful completion of a sexual abuse treatment program and whether or not visitation is in the best interests of the child. We further hold that LSA-R.S. 9:364(D) does not violate La. Const. Art. I, § 22's provision providing free access to courts, as it does not predicate access to the courts upon a potentially biased expert's determination of a parent's successful completion of a sexual abuse treatment program.
Next, we reverse the judgment of the juvenile court insofar as it found LSA-R.S. 9:367's mandatory assessment of costs to the perpetrator of family violence to be unconstitutionally vague and overbroad. The statute does provide a means for a court to limit arbitrary and excessive fees resulting from the treatment for the abuse itself and enforcement proceedings. This means is found in the statute's language limiting such costs to those that the court finds are "necessitated by" the violence. Thus, the statute satisfies La. Const. Art. I, § 2 and U.S. Const. Amend. XIV in their requirement of clear standards for the assessment of penalties.
Finally, we affirm the judgment of the juvenile court that LSA-R.S. 9:364(D)'s provision requiring the trial court to give "greater weight" to the testimony of the child's treating therapist is unconstitutional. We so hold because of this provision's intrusion on a constitutionally-mandated inherent power of the judiciary under La. Const. Art. II, § 2 (1974), that of independently evaluating evidence before it. As this section on giving "greater weight" is separable from the rest of LSA-R.S. 9:364(D), we uphold the remainder of the statute as written.
Accordingly, we remand this case to the juvenile court for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART, AND REMANDED.
DENNIS, J., concurs in part and dissents in part.
CALOGERO, C.J., dissents for the reasons assigned by DENNIS, J.
LEMMON, J., dissents and will assign reasons.
DENNIS, Justice, dissenting in part and concurring in part.
I respectfully (1) dissent from the majority's decision to uphold as constitutional the first sentence of La.R.S. 9:364(D), which provides that "[i]f any court finds that a parent *738 has sexually abused his or her child or children, the court shall prohibit all visitation and contact between the abusive parent and the children, until such time, following a contradictory hearing, that the court finds that the abusive parent has successfully completed a treatment program designed for such sexual abusers, and that supervised visitation is in the children's best interest. * * *."; and (2) concur in my colleagues' striking as unconstitutional the second sentence of La. R.S. 9:364(D) which provides that "[a]ny testimony by a licensed mental health professional with training, experience, and expertise in treating sexual abuse victims, who is the therapist for the abused child, shall be given greater weight by the court than other testimony on issues of visitation."

1. Procedural Due Process

A. Federal
The United States Supreme Court has held that proof by a clear and convincing or similar standard is required, either by the United States Constitution or by the applicable federal statute, in a variety of cases involving deprivations of individual rights not rising to the level of criminal prosecution, including termination of parental rights, Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), as well as civil commitment to a mental hospital, Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), denaturalization, Chaunt v. United States, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), and deportation, Woodby v. INS, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). See also 2 McCormick on Evidence § 340 at 442 (4th Ed.1992).
In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Supreme Court, in analyzing the factors enunciated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), observed that in parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight. Therefore, the high court held, "Evaluation of the three Eldridge factors compels the conclusion that use of a `fair preponderance of the evidence' standard in such proceedings is inconsistent with due process." Id. 455 U.S. at 758, 102 S.Ct. at 1397.
Santosky is not distinguishable from the present case upon the basis of any legal principle or relevant fact. First, the rationale of the Santosky decision was not limited to "permanent" parental termination proceedings. The Court clearly reaffirmed that an intermediate standard of proof"clear and convincing evidence"is mandated when the individual interests at stake in a state proceeding are both "particularly important" and "more substantial than mere loss of money." Id. at 756, 102 S.Ct. at 1396, citing Addington v. Texas, 441 U.S. at 424, 99 S.Ct. at 1808. Furthermore, the Court emphasized that it has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with "a significant deprivation of liberty" or "stigma" although the official actions in those cases were, at least to a degree, reversible. Id. 455 U.S. at 756, 759, 102 S.Ct. at 1396, 1397-98. See, e.g., Addington v. Texas, supra (civil commitment); Woodby v. INS, supra, (deportation); Chaunt v. United States, supra, (denaturalization); Schneiderman v. United States, supra, (denaturalization); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (juvenile delinquency adjudication). The Court in Santosky pointed out that few forms of state action are both as severe and irreversible as a New York decision terminating parental rights, but the Court did not in any way indicate that the irrevocability of the decision was essential to its holding that an elevated burden of proof was required. Santosky, 455 U.S. at 759, 102 S.Ct. at 1397-98.
Second, the termination of parental rights in the present case clearly is "a significant deprivation of liberty" or "stigma;" and it may well prove to be as "severe" and "irreversible" as the New York parental termination. While it is in effect, the present Louisiana termination, like the New York order, "denies the natural parent[] physical custody, as well as the rights ever to visit, *739 communicate with, or regain custody of the child." Id. at 749, 102 S.Ct. at 1392. Furthermore, these severe effects are likely to become permanent or irreversible when a parent insists on his innocence as the legitimate father of the child in the present case has done. Unless a parent admits to having abused his or her child, the physician conducting the parent's treatment program designed for sexual abusers probably will terminate treatment prior to its completion. See, e.g., Nelson v. Jones, 781 P.2d 964 (Alaska 1989). See also Annotation, Denial or restriction of visitation rights to parent charged with sexually abusing child, 1 A.L.R. 5th 776 (1992). In such a case, La.R.S. 9:364(D) would require that the court continue to "prohibit all visitation and contact between the abusive parent and the child[]" because the parent had failed to "successfully complete[] a treatment program designed for such sexual abusers...." Additionally, the Supreme Court and this court have rejected the notion that an invasion of parental rights can be disregarded because the parent might be able to regain access to his child by other means. See In re Adoption of B.G.S., 556 So.2d 545, 555 (La.1990). As the Supreme Court observed in Stanley v. Illinois, 405 U.S. 645, 647, 92 S.Ct. 1208, 1210-11, 31 L.Ed.2d 551 (1972), we have not
"embraced the general proposition that a wrong may be done if it can be undone. Cf. Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349] ... (1969). Surely, in the case before us, if there is delay between the doing and the undoing petitioner suffers from the deprivation of his child[], and the child[] suffer[s] from uncertainty and dislocation."
Third, a proper application of the three Eldridge factors compels the conclusion that use of a preponderance of evidence standard in a proceeding to determine whether a parent has sexually abused his child under La. R.S. 9:364(D) is a violation of procedural due process.
(1) The private interest involved is commanding: a legitimate or natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest more precious than any property right. Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397-98, 71 L.Ed.2d 599 (1982), quoting Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159-60, 68 L.Ed.2d 640 (1981), quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551 (1972). In government initiated proceedings to determine juvenile delinquency, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); civil commitment, Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); deportation, Woodby v. INS, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); and denaturalization, Chaunt v. United States, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), and Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), the Court deemed reversible or revocable losses of individual liberty sufficiently serious to warrant imposition of an elevated burden of proof. Santosky, 455 U.S. at 759, 102 S.Ct. at 1397-98. Because the legitimate father in the present case was subjected to government-initiated proceedings that threatened him with "a significant deprivation of liberty" and "stigma" that is severe and may well have nonreversible effects, the first Eldridge factorthe private interest affectedweighs heavily against the use of the preponderance standard.
The factfinding of whether the parent sexually abused the child does not purportand is not intendedto balance the child's interest in a normal family home against the parent's interest in raising the child. See Santosky, 455 U.S. at 759, 102 S.Ct. at 1397-98. Nor does it purport to determine whether the father or the mother would provide a better home. Rather, the factfinding hearing pits the State directly against the alleged sexually abusive parent. The State alleges that the parent sexually abused his child and should forfeit all rights to visit or have contact or communication with the child until he completes sexual abuse treatment and it is found to be in the child's best interest for him to resume contact with her.
At the factfinding hearing, the State cannot presume that a child and his parent are *740 adversaries. Until the State proves parental sexual abuse, the child and her parent share a vital interest in preventing erroneous termination of their natural or legitimate relationship. Thus, at the factfinding hearing, the interests of the child and her natural parent coincide to favor use of error-reducing procedures. Santosky, 455 U.S. at 760-61, 102 S.Ct. at 1398-99.
(2) The risk of error from using a preponderance standard is substantial: The factfinding stage of a state-initiated proceeding to terminate parental rights under La.R.S. 9:364(D) bears many of the indicia of a criminal trial. The instant proceeding was initiated by the district attorney alleging that A.C. was a Child in Need of Care as to the father. La.Ch.C. art. 631. In such a proceeding, the parent is served by summons commanding him to appear before the court. La.Ch.C. art. 636. Formal rules of evidence are employed at the factfinding hearing. La. Ch.C. art. 663. The State, the parent(s), and the child are all represented by counsel. La. Ch.C. arts. 607, 608. Motions are filed and discovery is taken. La.Ch.C. arts. 651-658. The State, during the factfinding proceeding presents evidence, calls witnesses which are subject to cross examination and attempts to establish the allegations of its petition and thus prove that the child is in need of care. La.Ch.C. arts. 659-665. Based on all the evidence, the court then determines whether the State has proved its allegations that the child is in need of care by a preponderance of the evidence. La.Ch.C. art. 666.
At such a proceeding, numerous factors combine to magnify the risks of erroneous factfinding. Sexual abuse termination proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge, particularly considering the highly subjective nature of expert witness testimony concerning sexual abuse, which, as the majority points out, is often heavily relied on and which involves evaluation of the parties' psychological states, which evaluations are susceptible to varying opinions on their certainty. Ante, 643 So.2d at 734, citing State v. Foret, 628 So.2d 1116 (La.1993).
The State's ability to amass its formidable forces to assemble its case inevitably dwarfs the parent's ability to defend it. Vast resources are at the State's disposal and the State's attorney will usually be expert on the issues and procedures involved in this type of factfinding proceeding. Furthermore, the State's primary witness will often times be their own social caseworkers whom the State empowers to investigate the situation and to testify against the parent. This disparity between the adversaries' litigation forces is heightened when one considers that the parent does not have any "double jeopardy" defense as a criminal defendant does, but rather the State may gather new evidence and try again to terminate the parent's rights. See Santosky, 455 U.S. at 763-64, 102 S.Ct. at 1399-01.
Considering all of the above, coupled with the use of a preponderance of the evidence standard, there is a significant prospect of error in the factfinding proceeding. This standard of proof, by its very terms, demands an evaluation of the quantity, rather than the quality, of the evidence and may misdirect the factfinder in the marginal case. Santosky, 455 U.S. at 764, 102 S.Ct. at 1400-01, citing In re Winship, 397 U.S., at 371, n. 3, 90 S.Ct. at 1076, n. 3 (Harlan, J., concurring). Given the significance of the interest at stake here, the cost of even occasional error is great. Santosky, 455 U.S. at 764, 102 S.Ct. at 1400. "`Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate' terminations will be ordered." Santosky, 455 U.S. at 764-65, 102 S.Ct. at 1400 quoting Addington v. Texas, 441 U.S. at 427, 99 S.Ct. at 1810.
The majority assumes that terminating the parent-child relationship invariably will benefit the child. However, as pointed out above, until there is an accurate determination that the parent has sexually abused the child, termination of the relationship is not in the child's best interest. See Santosky, 455 U.S. at 765, 102 S.Ct. at 1401. As Professor Blakesley has pointed out in his treatise on Louisiana family law:

*741 Louisiana courts have traditionally been reluctant to sever the parent-child relationship and to derogate from the natural rights and obligations inherent therein. The reluctance to sever the parent-child relationship is founded in the fundamental belief that a child has a right to know and to love his or her parents and that this right or interest should not be denied the child or the parents, except when the parent has proved to be unworthy or unfit. (emphasis added).
Blakesley, Louisiana Family Law, § 8.37 (1993). A standard of proof that allocates the risk of error nearly equally between termination of the parent-child relationship and maintaining that relationship, simply does not reflect the importance of the interests of both the child and the parent in maintaining that relationship until abuse has been properly proved. Therefore, the second Eldridge factorthe risk of erroralso weighs heavily against the use of the preponderance standard.
(3) The countervailing governmental interest favoring the preponderance standard is comparatively slight: Actually, a standard of proof more strict than the preponderance of evidence standard is consistent with both governmental interests at stake in parental rights termination proceedingsa parens patriae interest in preserving and promoting the welfare of the child, and a fiscal and administrative interest in reducing the cost and burden of such proceedings.
"Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision" at the sexual abuse factfinding proceeding. Lassiter, 452 U.S. at 27, 101 S.Ct. at 2160. While there is still reason to believe that a positive, nurturing parent-child relationship exists, the parens patriae interest favors preservation, not severance, of natural or legitimate familial bonds. Santosky, 455 U.S. at 766-67, 102 S.Ct. at 1401-02. "[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents." Stanley v. Illinois, 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972).
Unlike a constitutional requirement of hearings, see e.g., Eldridge, 424 U.S. at 347, 96 S.Ct. at 908-09, or court appointed counsel, a stricter standard of proof would reduce factual error without imposing substantial fiscal burdens upon the State. Santosky, 455 U.S. at 767, 102 S.Ct. at 1401. As the Supreme Court observed in Santosky, 35 states had at that time adopted a higher standard by statute or court decision without apparent effect on the speed, form or cost of their fact finding proceedings. Santosky, 455 U.S. at 749 n. 3, 767, 102 S.Ct. at 1392 n. 3, 1402.
Nor would an elevated standard of proof create any real administrative burdens for the State's factfinders. Louisiana judges already are familiar with a higher evidentiary standard in other parental rights termination proceedings not involving parental sexual abuse. La.Ch.C. art. 1035 requires clear and convincing proof of various statutorily defined types of parental unfitness before parental rights may be permanently and irrevocably terminated, see La.Ch.C. art. 1015(1), (4)-(10), and requires proof beyond a reasonable doubt when such termination of parental rights is based on conduct constituting a crime against the child or on grossly negligent behavior of the parent, La.Ch.C. art. 1015(2) & (3). Louisiana also demands at least clear and convincing evidence in proceedings of far less moment than parental rights termination proceedings. See, e.g., La.R.S. 38:2214(C) & La.R.S. 39:1594(F) (withdrawal of public contract bids for patent errors); La.R.S. 34:3108(E) & 3308(E) (lease of certain state lands); La.R.S. 31:43 (action on behalf of mineral servitude owner); La.R.S. 30:210 (injunction to prevent mineral prospecting on a highway right of way); La. R.S. 34:966, 1001, 1055 (negligence of bar pilots, river port pilots, and steamship pilots, respectively); La.R.S. 49:962.1 (unavoidable cause for delay by secretary of an agency in failing to respond to application for a permit, license, registration, variance, or compliance schedule); La.R.S. 4:536 (qualifications of applicant for a gaming license). I cannot believe that it would burden the state unduly to require that its factfinder have the same factual certainty when terminating the parent-child relationship as the factfinder must *742 have to determine whether one is qualified to obtain a gaming license.
Therefore, after careful consideration of all three Eldridge factors, I conclude that use of the preponderance standard in the present case does not afford the father his procedural due process rights guaranteed him under the Fifth Amendment to the United States Constitution. Instead, the clear and convincing standard must be used to ensure that the requirements of procedural due process are met.

B. State
This court has recognized that the reciprocal rights and obligations of natural parents and children are among those unenumerated rights retained by and guaranteed to individuals by Article I, § 24 of the Louisiana Constitution of 1974. Accordingly, this court has held that the interest of a natural parent in his or her relationship with the child is one of those liberties of which no person may be deprived without due process of law under our state constitution. La. Const.1974, Art. I, § 2. In re Adoption of B.G.S., 556 So.2d 545 (La.1990); See also, Wilson v. City of New Orleans, 479 So.2d 891 (La.1985); State v. Woodard, 387 So.2d 1066 (La.1980). In interpreting our state constitution by applying the Mathews v. Eldridge balancing test as we have done in the past, In re Adoption of B.G.S., supra; Wilson v. City of New Orleans, supra, it is evident that this court should conclude independently and separately that La.R.S. 9:364(D) violates the procedural due process guarantee of our state constitution.

2. State Substantive Due Process and Privacy, Personhood or Autonomy
Prior to the adoption of the 1974 Louisiana Constitution, the United States Supreme Court recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). While the outer limits of this aspect of privacy had not been marked by the Court, it was clearly recognized that freedom of personal choice in matters of family life was a fundamental liberty interest protected by the Fourteenth Amendment. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).
Article I, § 5 of the 1974 Louisiana Constitution expressly guarantees that every individual shall be secure in his "person" against "unreasonable searches, seizures, or invasions of privacy." Since 1974, this court and our courts of appeal have interpreted the right to privacy declared in Article I, § 5 to incorporate protection for several different categories of privacy interests. See Devlin, Privacy and Abortion Rights Under the Louisiana State Constitution: Could Roe v. Wade be Alive and Well in the Bayou State?, 51 La.L.Rev. 685 (1991). This affirmative right to privacy incorporates the principles of the United States Supreme Court privacy decisions in explicit statement and includes the right of an individual to make, without unjustified government interference, personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education. State v. Perry, 610 So.2d 746 (La.1992); Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1989).
Although the right to privacy or personhood is not absolute, where a decision as fundamental as those included within the right of personal privacy is involved, state action imposing a burden on it may be justified only by a compelling state interest, and such infringement on that right may be justified by regulations adopted to serve compelling state interests that cannot be achieved through means significantly less restrictive of privacy freedoms. State v. McHugh, 630 So.2d 1259 (La.1994); State v. Perry, supra; Hondroulis v. Schuhmacher, supra.
Applying these principles, I conclude that La.R.S. 9:364(D) sweeps unnecessarily broadly and thereby invades the area of protected freedoms. The state has within its power less drastic means of achieving the objectives of (a) determining whether a parent has sexually abused his or her child, and *743 (b) protecting the child from the abusive parent while he or she is undergoing treatment and rehabilitation.
As noted in the preceding section, until the state proves that the parent in fact sexually abused the child, the child and his or her parent share a vital interest in preventing erroneous termination of their relationship; and a standard of proof more strict than preponderance of the evidence is consistent with the interests of the child, the parent and the state.
After the state has established parental sexual abuse at the initial factfinding proceeding, it may be assumed at the dispositional stage that the interests of the child and the parent diverge partially and temporarily. But the state has within its power less drastic means of achieving the objectives of protecting the child from further adverse effects of the abuse while requiring that the parent undergo medical treatment than prohibiting all contact, communication and visitation in each and every case. Louisiana Revised Statutes 9:362(5) and 9:364(C) provide examples. Under La.R.S. 9:362(5), "Supervised visitation" is defined as "face to face contact between a parent and a child which occurs in the immediate presence of a supervising person approved by the court under conditions which prevent any physical abuse, threats, intimidation, abduction, or humiliation of either the abused parent or the child." Such supervised visitation is permitted in situations involving family violence not involving sexual abuse. Under La.R.S. 9:364(C), "If the court finds that a parent has a history of family violence, the court shall only allow supervised child visitation with that parent, conditioned upon that parent's participation in and completion of a treatment program."
Because the ultimate goal of La.R.S. 9:364(D) is restoration of the normal parent-child relationship after the parent has successfully completed treatment, an absolute prohibition of contact and communication in every case clearly is not the least restrictive means of furthering the State's objectives. Furthermore, as the trial judge pointed out, there are several other potential harsh consequences of the mandatory no contact requirement such as situations where "no treatment program (as defined by the Act) is available..., the parent is deemed "untreatable" by the professional ..., [or] the parent is unable to afford the cost of treatment. Under the provisions of the `Act' a parent under these circumstances would continue to be ineligible for visitation or contact, even if visitation and/or contact were in the best interest of the child." Tr.Ct.Reas. for Jdgmt. at 5.
It is clear that the absolute prohibition of contact and communication in every case, as is required by La.R.S. 9:364(D), is not the least restrictive means available to adequately achieve the State's interests. Therefore, La.R.S. 9:364(D) violates the substantive due process guarantee of Article I, § 2 and the right of privacy guarantee of Article I, § 5 of the Louisiana Constitution.
NOTES
[1] Marcus, J., not on panel. For the procedure employed in assigning cases after January 1, 1993 to rotating panels of seven justices, see State v. Barras, 615 So.2d 285, 286 n. 1 (La. 1993).
[2] La. Const. Art. 5, § 5(D) (1974) provides, in pertinent part, that

(i)n addition to other appeals provided by this constitution, a case shall be appealable to the supreme court if (1) a law or ordinance has been declared unconstitutional....
[3] The Fourteenth Amendment provides in pertinent part that "No State shall ... deprive any person of life, liberty, or property without due process of law...."
[4] La. Const. Art. I, § 2 (1974) provides that "(n)o person shall be deprived of life, liberty, or property, except by due process of law."
[5] The Louisiana counterpart to the New York statute at issue in Santosky is LSA-Ch.C. arts. 1001-1040, which provide for a "termination of all parental rights and responsibilities" as a "first step toward permanent placement of the child in a suitable home through the process of adoption." LSA-Ch.C. art. 1001. This termination comes about upon a finding of, amongst other things, "abuse" through "the involvement of the child in any sexual act with a parent." LSA-Ch.C. arts. 1001, 1003, 1015(3)(a).

The standard of proof in these permanent rights deprivation proceedings is set forth in LSA-Ch.C. art. 1035:
Where the petition alleges facts constituting criminal conduct under Article 1015(2) or grossly negligent behavior under Article 1015(3), such facts must be proven beyond a reasonable doubt. In the instances of all other grounds, the facts alleged must be proven by clear and convincing evidence. In all involuntary termination of parental rights proceedings, the parents shall be accorded due process of law.
Thus, where the interest itself is threatened, the Louisiana statutory scheme recognizes the need for the protections of a higher burden of proof than a mere "fair preponderance."
[6] This would have a definite impact on other areas of limitations on parental rights, such as proceedings involving LSA-R.S. 9:341 (formerly LSA-C.C. art. 133, amended and reenacted by Act 261 of 1993, effective January 1, 1994), which provides that

Whenever the court finds by a preponderance of evidence that a parent has subjected his or her child to cruel physical abuse, sexual abuse or exploitation, the court shall prohibit visitation between the abusive parent and the abused child until such parent proves that visitation would not cause physical, emotional, or psychological damage to the child. Should visitation be allowed, the court shall order such restrictions, conditions, and safeguards necessary to minimize any risk of harm to the child. All costs incurred in compliance with the provisions of this Article shall be borne by the abusive parent.
In dealing with Santosky as applied to this Article, the court in W.M.E. v. E.J.E., 619 So.2d 707 (La.App. 3d Cir.1993), held that the suspension of visitation did not require a clear and convincing standard of proof, as the suspension of the parental rights was not so grave a deprivation as a total termination of parental rights.
[7] This judgment is well within the legislature's police power "to impose laws and regulations which are reasonably related to the protection and promotion of a public good such as health, safety, or welfare." City of Shreveport v. Restivo, 491 So.2d 377 (La.1986). The interest at stake is, of course, protection of a child from the threat of further abuse at the hands of a parent.
[8] Appellant correctly points out that the legislature is acting well-within its parens patriae authority by prescribing a mandatory termination of visitation upon a judicial finding of sexual abuse, as "the family itself is not beyond regulation in the public interest...." Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 167, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The legislative determination that mandatory termination of visitation is required upon a judicial finding of abuse is analogous to the legislative determination of punishment for a crime, once its elements are judicially ascertained. This court, in State v. Normand, 285 So.2d 210, 211 (La.1973) stated that "it is entirely proper that [the legislature] determine what constitutes the crime and what punishment shall be meted out by the court after the judicial ascertainment of guilt." It follows that, once a court determines that the elements of child sexual abuse are present, the legislature can determine what remedy it deems appropriate to protect "the paramount interest which society has in seeing to it that [children] be well taken care of and properly brought up...." State v. Garza, 217 La. 532, 46 So.2d 760, 762 (1950).
[9] LSA-R.S.Ch.C. art. 406 provides, in pertinent part, that "(i)n its discretion, the court may waive costs and fees to the extent that a party is unable to pay such costs and fees due to poverty or lack of means." Articles 655 and 669 set up a scheme where the parent can be ordered to provide "necessary" medical care and mental examination or evaluation. Finally, LSA-Ch.C. art. 685 provides that, where disposition of the child puts him or her in custody other than that of his parents,

the court may, after giving the parent a reasonable opportunity to be heard, order that such parent contribute to the cost of care of the child in an amount commensurate with the parent's ability to pay for such care.