MOORE, J.
11 This is an appeal of a judgment that terminated the parental rights of the mother and father of B.H. Only the mother appeals, alleging several assignments of error. After our review of the entire record in this case, we affirm.
Facts
The child was born prematurely on September 12, 2005 at Willis-Knighton Medical Center in Bossier City. He had cocaine in his system at birth. On the day following B.H’s birth, the hospital contacted the Bossier Office of Community Services (“OCS”). A report from that agency in the record states that the parents, J.H. and A.H., were living in a local hotel, and they did not have a stable place to live, nor adequate finances to purchase adequate baby supplies to permit the baby to be discharged. While they admitted they used drugs, they expressed their desire to become clean of drugs and get their lives in order.
The mother, A.H., was discharged on September 14, 2005, while the baby remained in the hospital for monitoring. Caseworkers and health care providers made arrangements to permit the parents to live at the hospital, so they could learn proper care for the child and be provided an appropriate home environment. The OCS remained in contact with the hospital’s social worker to monitor the parents’ progress.
Despite these efforts, the parents disappeared from the hospital on or around September 21, 2005. A caseworker was able to track the father down by following up on a cell phone call from a friend of J.H. She spoke to J.H., who told her they had gone to Indiana to take care of some warrants 12in order to stay out of jail. J.H. said they were looking for an apartment near the hospital. The caseworker urged the parents to visit the child immediately, but the parents did not come to the hospital.
*884 On September 30, 2005, by Instanter Order, the district court placed B.H. into the custody of the Department of Social Services. A continued custody hearing was held on October 5, 2005, and B.H. was continued in the custody of the department. Neither parent was present at this hearing and their whereabouts were unknown. B.H. was placed in foster care on October 6, 2005. Pursuant to a petition filed by the Bossier Parish District Attorney, the child was declared a Child In Need Of Care by the Bossier Parish City Court on December 2, 2005. A.H. was not present at the hearing.
The OCS was familiar with A.H. and J.H., who have three older children in foster care. Regarding B.H., the OCS developed case plans on October 25, 2005, March 30, 2006, and September 21, 2006, designed to rehabilitate A.H. in order to reunite her with B.H. since she, as well as J.H. (who also had a case plan), had expressed a desire to get straight and be reunited with B.H. These court-reviewed and approved plans are ordinarily developed with input from the parents, but at least with the initial plans, the parents, however, could not be located because their whereabouts were unknown.
Among other things, the case plan called for A.H. to acknowledge the reasons that B.H. was in foster care by verbalizing her failures and recognizing the barriers that would prevent return of the child, namely, lack |sof supervision, abandonment, substance abuse, and blaming her children for her substance abuse. She was also required to provide a safe home environment by learning and demonstrating appropriate discipline techniques, keeping drugs and alcohol away from the home, improving her judgment regarding protection of her children and encouraging them during foster care. The plan called for A.H. to attend parenting and anger management classes and provide certificates to the agency of her attendance. The agency agreed to notify her of the schedule and provide transportation to the classes if she could not provide her own transportation. A.H. was required to report to the agency if she could not attend. A.H. was to submit to a substance abuse evaluation and comply with the recommendations of the evaluation. She would agree to random substance abuse testing, use only prescribed medications, and stop interaction and involvement with people involved in drugs and addictive substances. The plan also required A.H. to submit to a psychological evaluation and assessment, and follow up on the recommendations of the evaluation. Again, the agency agreed to arrange for the evaluation and inform A.H. of the scheduled date. Importantly, the plan required A.H. to keep the caseworker updated on changes in her personal situation, including changes of address and telephone numbers.
After disappearing for six months, A.H. turned up in March of 2006 after she was arrested for possession of crack cocaine. In May, she pled guilty to the charge and received a five-year suspended sentence, with two years supervised probation. She entered a halfway house, the Christopher RHouse, in May of 2006. During this time she returned to work for General Motors.
In August of 2006, A.H. left the Christopher House, and was subsequently arrested for violation of her probation for, among other things, testing positive for cocaine and criminal trespass. A.H. is currently an inmate at the women’s prison in St. Gabriel, Louisiana. She testified that she is eligible for release from incarceration in March of 2008.
On January 31, 2007, the state began termination of parental rights proceedings. However, despite being offered assistance by the department, the parents failed to *885 comply with the case plan for rehabilitation and essentially abandoned the child. Extended family members who were contacted by the OCS stated that they were not interested in raising the child or assisting in the care of the child in any way.
A hearing or trial was held on March 30, 2007, both parents were present by court order at the termination of the parental rights hearing. The court ruled from the bench and judgment was signed on May 9, 2007.
The court determined that B.H. had been in state custody since shortly after his birth. The court made findings that both parents had abandoned the child for periods longer than four months, failed to contribute to the support of the child for six months, and had substantially failed to comply with the case plans social workers had made for them, nor did they make any measurable progress since the plans were implemented. They have not given the child any material support ever and both were currently in prison with the earliest date of possible release in March of 2008. The court | ^concluded that there was no reasonable expectation that they would improve in the future, and the child was in need of a permanent and stable home environment now. It therefore terminated the parental rights of both parents as requested by the state and certified B.H. as eligible for adoption.
The mother has appealed. In her appeal, appellant alleges that the trial court erred in finding that the state carried its burden of proof for termination of parental rights under Louisiana Children’s Code article 1015(4) and 1015(5), and the court erred in finding that it was in the best interest of B.H. to terminate the parental rights of his mother.
Discussion
It is well-established that a parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. State in the Interest of AC., 93-1125 (La.1/27/94); 643 So.2d 719. This parental interest includes the “companionship, care, custody, and management of his or her children.” Id. at 726 (quoting Lassiter v. Department of Social Svcs., 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640 (1981)). Congruent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. State in the Interest of AC., 93-1125 (La.10/17/94); 643 So.2d 743, cert. denied, 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995).
Termination of parental rights is a severe and terminal action, so the legislature has mandated that in order to terminate these rights, the state must satisfy an onerous burden of proof. Namely, it bears the burden of ^establishing each element of a ground for termination of parental rights by clear and convincing evidence. La. Ch. C. art. 1035; State in Interest of D.G. v. Danny G., 30,196 (La. App. 2 Cir. 10/29/97), 702 So.2d 43. Although there are seven statutory grounds for involuntary termination of parental rights set forth in La. Ch. C. art. 1015, only one ground need be established. State ex rel. SNW v. Mitchell, 2001-2128 (La.11/28/01), 800 So.2d 809; State in Interest of D.G. v. Danny G., supra. Pursuant to the clear and convincing proof standard, the state must show that the parents’ failure to comply with the enumerated condition is highly probable. State in the Interest of Q.P., 94-609 (La.App. 3 Cir. 11/2/94); 649 So.2d 512. Once a ground for termination has been established, the judge may terminate parental rights if the termination is in the best interest of the child. La. Ch. C. art. 1039.
*886 In termination of parental rights cases, the trial court’s factual findings, including the finding that a parent is unfit and there is no reasonable expectation of reformation, will not be set aside in the absence of manifest error. State, Dept. of Social Services ex rel. D.L.F. v. Phillips, 84,645 (La.App. 2 Cir. 4/4/01), 785 So.2d 155; State in Interest of KLB v. Biggs, 29,512 (La.App. 2 Cir. 2/28/97), 690 So.2d 965; State in Interest of S.D. v. Moore, 31,192 (La.App. 2 Cir. 8/19/98), 717 So.2d 265.
According to La. Ch. C. art. 1015(4) and (5), the grounds for termination of parental rights include: * * *
(4) Abandonment of the child by placing him in the physical custody of a nonpar-ent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to ^permanently avoid parental responsibility by any of the following:
(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child’s parent continue to be unknown.
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
La. Ch. C. art. 1036(C) provides that lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
ls(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
The state must prove that the parent is unfit to retain parental control and that there is no reasonable expectation of reformation in the foreseeable future in order to obtain termination of parental rights when the child has been removed from the parent’s home. State in Interest *887 of D.T. v. K.T., 29,796 (La.App. 2 Cir. 6/18/97), 697 So.2d 665. Lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by any physical or mental illness, mental deficiency, substance abuse or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior. La. Ch. C. art. 1036(D)(1).
By her first two assignments of error, appellant contends that the trial court erred by finding that the state carried its burden of proof under La. Ch. C. art. 1015(4) and (5). The trial court found that the state had met its burden under both paragraphs of Art. 1015. The issue A.H. raises under her first assignment concerns the trial court’s finding that she failed to make significant contributions toward the child’s care and support despite the fact that they were sporadically employed and sometimes earned a good wage. A.H. argues that she was not required in her case plan nor was she ever asked to care for or to make contributions toward the child’s care and support. Additionally, she notes that Patricia Cover, the caseworker from |flthe OCS assigned to this case, testified that A.H. did on occasion purchase some items for the child. She contends the state should have asked her to make contributions in her case plan.
A.H. testified that she was employed by General Motors, and she earned approximately $800 to $900 per week when she was not incarcerated. Although the record of testimony is not precise regarding the exact time periods she was actually working at GM and the time periods she was not working due to incarceration, the record indicates that she was working at GM during the time she was living at the Christopher House. In other testimony, A.H. said she did not attend a scheduled appointment set up by the state because it conflicted with her work. It is clear, therefore, that while A.H. did not maintain steady employment due to incarceration, there were some periods of employment.
In Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982), the United States Supreme Court recognized that natural parents have a fundamental liberty interest in the care, custody, and management of their child and that the natural parents’ interest does not “evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.” The court went on to acknowledge that while the state has an “urgent interest” in a child’s welfare and in providing the child with a permanent home, as long as there is reason to believe that a positive, nurturing parent-child relationship exists, the state’s interest must favor preservation over severance of natural familial bonds. Id. at 766, 102 S.Ct. at 1401 (quoting Lassiter v. Department of Soc. Servs., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Thus, the court found that parents who are faced with the possibility of forced dissolution of their parental rights must be provided with fundamentally fair procedures in order to ensure that children’s legal bonds are not erroneously severed from fit parents. Id. at 753-54, 102 S.Ct. at 1395; State ex rel. G.J.L., 00-3278 (La.6/29/01), 791 So.2d 80, 84.
Louisiana Children’s Code article 1015(4)(b) provides that proof of a parent’s intention to permanently avoid parental responsibility is demonstrated by his or her failing to provide significant contributions to the child’s care and support for any six consecutive months.
*888 Louisiana Civil Code article 227 provides that “[fathers and mothers, by the very act of marrying, contract together the obligation of supporting, maintaining, and educating their children.” Clearly the children are the intended beneficiaries of this obligation. Moreover, this obligation to support offspring is not restricted to married parents; rather, the fact of paternity or maternity, and not the act of marriage, obliges parents to nourish and rear their children. Hogan v. Hogan, 549 So.2d 267 (La.1989) (citing 1 M. Planiol, Civil Law Treatise, pt. 2, § 1681).
On the other hand, the cases we have reviewed regarding a finding by the trial court that the parent failed to provide significant support to a child or children in state custody all involved the parent’s failure to voluntarily pay support or make specified support payments called for in the case plan. See State ex rel. A.T., 2006-0501 (La.7/6/06), 936 So.2d 79; State ex rel. M.H. v. K.W.H., 40,332 (La.App. 2 Cir. 9/23/05), 912 So.2d 88; State in the Interest of P.A.R., 2006-423 (La,App. 3 Cir. 10/18/06), 942 So.2d 57; State ex rel. M.L., 2000-153 (La.App. 3 Cir. 5/3/00), 761 So.2d 103.. In this instance, however, the case plan does not call for or specify any parental contribution. Ms. Cover stated that these plans are generally developed in consultation with the parents, who were absent in this case. A.H. did not attend these meetings either because she failed to notify the OCS of her whereabouts and had disappeared or, even when she received actual notice, she did not attend. Thus we can surmise that the likely reason that there was no parent’s financial contribution assessment on the case plan form was because neither parent attended the scheduled meetings to create the case plan even when they were given notice. The case plan was thus initially adopted, approved by the court and reviewed as required by law.
Although it is clear from this record that A.H. did not make significant contributions in support of B.H., we conclude that because the case plan did not call for A.H. to make any financial contributions toward the care and support of the child, and there was no testimony that anyone ever requested that she make financial contributions to support B.H. once the child was in state custody and in foster care, we conclude that the trial court erred in ruling that the state had met its very heavy burden on this single issue of fact. We emphasize, however, that our holding on this issue is based upon the specific facts of this case, and should not be construed to create a rule that a parent has no obligation to provide significant support absent such an order in the case plan.
|i?A.H. argues also that the trial court was incorrect in its conclusion that the parents failed to have significant contact with the child because of their own actions. The record shows that during the 18 months since his birth, A.H. saw the child only these six times even though the case plan called for her to visit the child every two weeks. Hence, out of a possible 36 visits, A.H. made it to only six visitations, and these occurred between May and August of 2006 when she was temporarily undergoing rehab. The father visited the child only once after his birth. A.H. was incarcerated for significant periods during this time.
A.H. contends that the trial court erred as a matter of law by concluding that incarceration is categorically not a defense or “just cause” for the parents failing to maintain significant contact with the child because it was their own decision to violate the criminal statutes. The alleged error of law is that the trial court’s ruling could be construed to mean that the court ruled as a matter of law that inear- *889 ceration can never be a just cause for not maintaining contact with the child.
The trial court cited State ex rel. J.T.C., 04-1096 (La.App. 5 Cir. 5/15/05), 895 So.2d 607 in its ruling. In that case, the court stated that the issue of incarceration should be decided on a case-by-case basis, recognizing that facts may vary regarding this issue and each case is decided upon its particular merits.
The facts of this case are somewhat analogous to those in State ex rel. M.H. v. K.W.H., supra, which involved the incarceration issue in the context of significant contributions toward support of the children. In his appeal of |iathe judgment terminating his parental rights, the father argued that the state failed to carry its burden of proving that he demonstrated an intent to permanently avoid all parental responsibilities by showing that he did not provide support for his children. He argued that his incarceration prohibited him from supporting the children, and therefore the failure was justified. We noted in our opinion that “just cause” is an affirmative defense which allows a parent, after the state has proven abandonment for failure to provide for the children’s care and support, to prevent termination by proving that the failure was with just cause and excusable. Id. at 92; State in Interest of M.L., 95-0045 (La.9/5/95), 660 So.2d 830.
The state adduced testimony indicating that the father had provided gifts to the children during one visit, but he did not provide financial support prior to being incarcerated, nor did he provide support while he was in jail. The father’s sole justification for the failure to support the children is that he was incarcerated. We rejected this argument, stating that incarceration is not a just cause defense for failure to support children or maintain contact with them in a termination of parental rights case if the parent is incarcerated as a result of his own actions. Id. at 92; State ex rel. J.T.C., supra. We concluded that the state had carried its burden of proof of showing that the father had failed to significantly contribute to his children’s care and support under Art. 1015(4).
The evidence and testimony at the termination proceedings in the case sub judi-ce indicate that A.H. disappeared from the hospital around September 21, 2005, some nine days after B.H. was born. The OCS | ^caseworker, Ms. Cover, was able to track down J.H. on September 29 by calling the cell phone number of an anonymous caller to the hospital who was not- J.H., but a friend. She urged them to come to the hospital to visit B.H., but despite promises, it was to no avail. A.H. did not notify the OCS of her whereabouts for several months. Ms. Cover did not know of A.H.’s whereabouts from September of 2005 until March of 2006, despite efforts to find her from relatives, contacting jails and newspapers. During this period, A.H. provided no support for the child, nor any letters, cards or gifts for the child. During the entire period from September 30, 2005 until January 31, 2007, she visited the child only six times, and these visits were confined to the relatively short period between May and August of- 2006 while she was living in the Christopher House.
Ms. Jennifer Yarborough testified that she supervised A.H.’s probation beginning May 2, 2006. The record shows that A.H. was arrested on March 10, 2006 for possession of crack cocaine. She pled guilty to possession of cocaine on May 2, 2006. She received a 5-year sentence, suspended, with two years supervised probation. Her probation was revoked because she subsequently violated her probation by testing positive for cocaine on August 31, 2006 and September 8, 2006. She was also arrested for criminal trespass on September 18, *890 2006. Ms. Yarborough testified that A.H. also failed to keep her probation supervisor informed of her whereabouts, moving on August 1, August 25 and September 15, 2006, all without notification to the probation officer. A.H. was referred to a substance abuse program on August 31, but did not show up for two [1Bscheduled appointments. Finally, she showed up on September 8, but did not participate in the group sessions and was dismissed from the program for refusal to participate.
Based on this record and testimony, we find no error of law or fact in the trial court’s conclusion that A.H.’s incarceration was not a defense to her failure to maintain contact with the child. The facts show that A.H. failed to maintain the contact required in the case plan even when she was . not incarcerated. The record shows the trial court considered the facts in this case and correctly concluded that AH.’s incarceration is not just cause in this case for her failure to maintain contact with the child. We hold that under the particular facts and circumstances in this case established by the record and testimony, the state proved by clear and convincing evidence that A.H. demonstrated an intention to permanently avoid parental responsibility, by failing to maintain significant contact with B.H.,by not visiting him or communicating with him for a period of six consecutive months.
With regard to appellant’s second assignment, that is, that the trial court erred by finding that termination was warranted under Art. 1015(5), A.H. contends that the OCS failed to provide rehabilitative services to her so that she could comply with , her case plan. Specifically, she argues that the trial court erred by stating that it was unaware of any authority that required the department to track down the parents to determine their whereabouts or their residence, or to provide services for substance abuse, psychological evaluations, parenting counseling, visitation, or other such services while the parents are incarcerated. It contends that the state failed | ir,to assist A.H. in working her case plan in many particulars, including (1) failing to assist her in finding housing; (2) failing to timely schedule drug testing or to continue it once she was incarcerated; (3) failure to timely schedule her psychological evaluation once she was incarcerated; (4) failing to provide visitation while she was incarcerated; (5) failing to timely inform her that the state would not accept the parenting class she completed; and, (6) failing to recognize the substance abuse class she had completed and failing to inform her that it did not accept this treatment and failing to schedule treatment for her.
To support these contentions, A.H. relies on the supreme court case of State ex rel. A.T., 2006-0501 (La.7/6/06), 936 So.2d 79. In that case the supreme court held that the OCS has an obligation to make reasonable efforts to assist the parent in finding suitable housing before it may seek to terminate parental rights under La. Ch. C. art. 1015(5). (Emphasis purs). The court affirmed the judgment of the appellate court reversing the trial court’s judgment that terminated the parental rights of the mother with respect to her three children. Both fathers voluntarily surrendered their parental rights at the termination hearing.
The key issue in the case concerned the mother’s failure to provide adequate housing for the children as called for in the case plan. The first case plan filed by OCS required several actions be taken by the mother toward achieving the goal of reunification, including: obtaining and maintaining adequate housing for her family; obtaining and maintaining employment and income sufficient to support her family; contributing ⅜50 h7per month to *891 the care of her children; obtaining spousal abuse assistance and refraining from involvement in relationships that may include domestic violence; completing a substance abuse assessment and participating in drug screens; and attending all scheduled visitations with her children.
The OCS filed a petition for termination of parental rights and a trial was held on June 28, 2005. Karen Fontenot, the mother’s OCS caseworker, testified at trial that the mother had failed to comply with the case plans. According to Ms. Fontenot, the mother’s major failure was that throughout the entire time period, she continued to live with her own mother in the two-bedroom trailer that was not appropriate because the grandmother would not allow the children to live there.[1] The mother never identified a home for the OCS to come look at where she wanted her children to live. When asked “[d]o you know of any services or referrals that the department could give to the mother that they have not done so?”, Ms. Fontenot answered “I personally can’t think of anything that was not offered.” She was never questioned specifically about any services that were offered to Ms. A to assist her in finding suitable housing, however, it is undisputed that after the children were turned over to the OCS in October of 2002, the OCS provided no assistance or services to Ms. A to assist her in obtaining adequate housing.
|1sBased on these facts, the supreme court held that the trial court’s order terminating parental rights under La. Ch. C. art. 1015(5) was erroneous because the record reflected that the OCS never undertook reasonable efforts at reunification after the children were taken into state custody. Specifically, the OCS offered no rehabilitative services to the mother to assist her in obtaining suitable housing after the children were taken into custody, “yet this was the main, if not sole, impediment to reunification cited continuously by OCS.” Id. at 85.
Turning now to the instant case, we conclude that the facts of State ex rel. A.T., supra, are inapposite. We note initially that in the instant case, A.H. complains about the trial court’s statement while ruling that it knew of no authority that .required the OCS to provide certain rehabilitative services which she now complains she was not offered while she was incarcerated. The mother in State ex rel. AT., supra was not incarcerated when the OCS failed to assist her in finding housing. In this case, A.H. is incarcerated in the women’s prison at St. Gabriel, Louisiana, well over two hundred miles from this area. On the other hand, B.H. is in foster care with local foster parents. We therefore conclude that it would be unreasonable to require the OCS to interfere with the Department of Corrections to schedule OCS drug screening, psychological testing and visitations for A.H.
A more critical point relevant to the outcome of this case is that, unlike the mother in State ex rel. A.T., supra, A.H. failed to keep the OCS apprised of her whereabouts both when she was in or out of jail. This fact alone was enough to justify a finding by clear and convincing evidence that |1SA.H. abandoned B.H. un *892 der La. Ch. C. 1015(4)(a). Nevertheless, the record indicates that Ms. Cover from the OCS undertook considerable efforts to locate A.H. and her husband, despite the fact that the obligation rested with A.H. We find it difficult to comprehend how A.H. can reason that the OCS has somehow failed to provide her with rehabilitative services when, for the most part, the OCS could never find her because she failed to supply the OCS with any information of her whereabouts so that such services could be offered. It is also clear from this record that when A.H. was located and apprised of meetings regarding the case plans, her psychological assessment, substance abuse tests, etc., she failed to appear for inexcusable reasons or no reasons at all.
Finally, we observe that the supreme court’s primary concern in State ex rel. A.T., supra, was that the sole grounds for which the state sought to terminate the mother’s parental rights could be simply the result of poverty. The mother had substantially complied with all the other requirements in her case plans. By contrast, in this instance, A.H. has essentially failed to meet all of the substantial requirements of her case plan. For this reason, we conclude that A.H.’s argument that the state failed to provide her with the rehabilitative services she needed while she was incarcerated and while she was not incarcerated is without merit.

Best Interest of the Child

Finally, A.H. complains that the trial court did not state any particularized reason why it was in the best interest of the child that A.H.’s parental rights be terminated. She claims there was no testimony as to why [⅞0⅛ would be in the child’s best interest.
We have no hesitation in affirming the trial court’s finding that it is in the best interest of B.H. to terminate A.H.’s parental rights. There is no question that more than a year has passed in which B.H. was removed from A.H.’s custody and she has not since substantially complied with her case plan. La. Ch. C. art. 1015(5). Alter abandoning B.H. shortly after he was born, A.H. saw the child only six times over the next 18 months. She was clearly using cocaine at the time the child was born. Although she expressed a desire to get straight after the baby was born, she went straight back to using cocaine and disappeared for six months, when she was arrested for possession of cocaine. Finally, she tested positive again for cocaine use in August or September of 2006. The evidence is overwhelming that A.H. failed to complete to any appreciable degree the requirements of her court-approved case plans. She failed to keep the OCS and her probation officer informed of her whereabouts; she intentionally did not submit to a scheduled psychological evaluation; she failed to complete an approved parenting class; she failed to submit to drug screens; she failed to complete a substance abuse assessment; she failed to establish and maintain a home to which she could bring B.H.; and, she ignored the advice and warning of the OCS not to leave the Christopher House to reunite with her husband, who was having the same problems with drug use, criminal behavior, and failure to comply with his case plan. Clearly, the court was correct in concluding that, based on the pattern of behavior she exhibited, there was no reasonable expectation of improvement in her conduct by A.H.
l2rThe purpose of a termination proceeding is to serve the best interests of the child which includes achieving permanency and stability for the child. State ex rel. D.S.C. v. J.C.R., 35,898 (La.App. 2 Cir. 2/27/02), 811 So.2d 198. Considering the child’s age and his need for a safe, stable and permanent home, and the evidence *893 that A.H. is unwilling to provide such a home, we conclude that the trial court did not err in concluding that it is in the best interest of B.H. that the parental rights of A.H. be terminated.
Conclusion
We therefore conclude that the trial court did not err in law or commit manifest error in finding that A.H.’s parental rights must be terminated. Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.

. The mother apparently substantially met the other goals in the case plan. Although she initially failed to pay her support obligation for 11 months, thereafter she maintained a steady stream of jobs and paid child support through garnishments of $66 per month per child. In addition, while the mother went to a substance evaluation and then missed several sessions, the OCS received notification that she did not need substance abuse treatment. The mother attended all visitations with the children except one, passed all drug screens, and attended a spousal abuse program on March 25, 2003.