STATE OF LOUISIANA IN THE INTEREST OF C.R., C.D., AND C.T.
No. 43,767-JAC.
Court of Appeals of Louisiana, Second Circuit.
September 17, 2008.
KATY G. BALSAMO, VICKI GREEN, Counsel for Appellant, J.T.
SCOTT E. McELROY, Counsel for the children.
LAURIE W. POLAND, DANIEL J. ELLENDER, Counsel for Appellee, Dept. of Social Services.
ELIZABETH C. BROWN, DERRICK K. WILLIAMS, Counsel for Appellees.
Before WILLIAMS, GASKINS and CARAWAY, JJ.
CARAWAY, J.
Three minor children were placed in state custody on June 10, 2005. After efforts at reunification with two of the children failed and the permanent plan changed to adoption, the trial court terminated the parental rights of the mother of the two children. The mother appeals. Finding that the State did not meet its burden of proof for clear and convincing evidence for the termination of parental rights, we reverse in part, affirm in part and remand for further proceedings.

Facts
J.T. is the mother of three minor children, C.R. (dob 12/8/96), C.D. (dob 1/25/01), and C.T. (dob 2/7/03), by three different fathers. J.T. remains married to C.T.'s father, J.M.T., who at the time of trial was incarcerated on drug charges serving a 22-month sentence.
On May 31, 2005, the Louisiana Department of Social Services, Office of Social Services (hereinafter "OCS") responded to a complaint that C.R., C.D. and C.T. had been left alone in their Morehouse Parish home without adult supervision on May 28 and May 29, 2005. Morehouse Parish Sheriff's deputies discovered the children alone in the home after J.T. had reportedly left the residence in search of J.M.T. J.T. claimed that she had asked neighbors to watch the children. After she reportedly resisted, J.T. was arrested for three counts of criminal neglect of family. This was the second instance of J.T.'s lack of supervision in 2005 and her second arrest. Reports also indicate that J.T. had two valid prior cases of abuse relating to C.R. in October 2001 and April 2003.
An oral instanter order placed the children in the custody of OCS on June 8, 2005. C.R. was placed in the foster care of her paternal grandparents and C.T. and C.D. were placed in private foster care. In October 2005, C.T. was placed with her paternal grandparents. On October 17, 2006, OCS supervision of C.D. terminated by judgment granting custody of the child to his biological father.
The state petitioned for a need of care proceeding for the children on July 13, 2005. The judgment adjudicating the children in need of care was signed on April 19, 2006. The Initial Family Team Conference occurred on July 13, 2005. J.T. and J.M.T. failed to attend the second Family Team Conference which was held on December 14, 2005, due to transportation issues. Thereafter, Family Team Conferences occurred twice a year through December 2007. Supervised family visitation also occurred on a monthly basis.
The concerns of OCS for the family included the volatile nature of J.T. and J.M.T.'s relationship. Both parenting classes and anger management training were recommended for the parents. Likewise, both were required to undergo psychological and drug abuse evaluation. The sporadic employment of both parents was also an OCS concern.
OCS initially recommended a permanent plan of reunification due to the close bond between the parents and children. By June 2006, however, OCS sought to change its goal from reunification to adoption for C.T. and C.R. based upon J.T. and J.M.T.'s failure to complete their case plan. Specifically, OCS alleged that the couple failed to complete anger management and parenting classes. In September 2006, OCS reported that J.T. had been arrested for three instances of domestic disturbances in July 2006. A permanency hearing judgment on October 11, 2006, changed the permanent plan for C.T. and C.R. to adoption.
On June 18, 2007, OCS filed a termination of parental rights petition (hereinafter referred to as the "TPR petition") concerning the mother, J.T. OCS also sought termination of J.M.T.'s parental rights relating to C.T. and requested that the court approve an act of voluntary surrender by C.R.'s biological father.
OCS alleged that J.T. failed to substantially comply with the case plan for the following reasons:
1. J.T. failed to maintain a home free of violence because she failed to successfully complete an anger management program or discuss or demonstrate skills learned during anger management classes. J.T. also failed to participate in counseling to address issues revealed in her psychological evaluation.
2. J.T. failed to parent her children in an emotionally healthy manner because she failed to complete a parenting program or demonstrate skills learned in the training. J.T. also failed to be supportive of the children's placements. Although she attended a majority of family visits, she failed to notify the agency prior to missing visits.
3. J.T. failed to maintain an adequate and stable home for the children in that she failed to maintain an income sufficient to meet her needs and those of her children.
4. J.T. has failed to maintain a home free of drug abuse by failing to complete Al-Anon sessions and in failing to follow recommendations made to her in substance abuse assessment.
5. J.T. was not cooperative with the OCS in developing a permanent plan for her children by not making herself available for scheduled and unscheduled home OCS visits. J.T. denied further access to her home by OCS and has failed to attend all conferences and court hearings.
The TPR petition alleged further that there was no reasonable expectation of significant improvement in J.T's condition or conduct in the near future for the following reasons:
Based on [J.T.]'s overall failure to comply with the case plan, the State avers that her conduct, behavior and condition is such that there is no likelihood of significant improvement in the near future. These children deserve a safe, stable, and permanent home, and [J.T.] appears incapable of providing a stable home.
The termination trial began in October 2007 and concluded after three days of trial on February 28, 2008. The court took the matter under advisement and rendered oral judgment terminating the parental rights of J.T. and J.M.T. on March 12, 2008. These oral reasons were given by the trial court:
The problem that the Court sees overriding this entire matter is that Ms. [T] has failed to make the significant life changes to insure that her children will be protected. I do think that Ms. [T] has begun to make some changes that I think are very positive.
* * *
The Court specifically finds that she has been unable to demonstrate that aspects of her case plan which include demonstrating that she has learned certain information, learned how to put into place the information which she learned in her anger management courses and her parenting classes and that she is still unable to provide a home an[d] support for her children. There was much discussion about her inability to get along with Ms. Janine Brown and how that impacted this case and the Court finds that she definitely could not get along with Ms. Brown and that was a major factor in what took her so long to work the case plan. The Court finds that she is simply unable to get along with anyone based on her own testimony and that included her own family. I'm clear from observations of her that in her mind Ms. [T] believes that she has done the best that she could do and assuming that that is true, I don't see that she can do any better than what she's doing currently. She continues to make excuses for her behavior and for her inability to completely comply with her case plan. And so for these reasons the Court does find that the State proved its case by clear and convincing evidence and that it is in the best interest of the children to terminate her parental rights and I order that termination of both parents' parental rights occur at this point in time and that the children are certified for adoption. . . . A written judgment followed on April 7, 2008. J.T. has appealed the judgment terminating her parental rights to C.T. and C.R.[1]

Discussion
It is well-established that a parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. State in Interest of A.G., 93-1125 (La. 1/27/94), 643 So.2d 719, cert. denied, 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995); State in Interest of B.H. v. A.H., 42,864 (La. App. 2d Cir. 10/24/07), 968 So. 2d 881. This parental interest includes the companionship, care, custody, and management of his or her children. Id. Congruent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. State in Interest of A.C., supra.
Natural parents have a fundamental liberty interest in the care, custody, and management of their child and the natural parents' interest does not "evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." State in Interest of IM., IP.M., and MM, 02-2089 (La. 1/28/03), 837 So. 2d 1247. Parents who are faced with the possibility of forced dissolution of their parental rights must be provided with fundamentally fair procedures in order to ensure that children's bonds are not erroneously severed from fit parents. Id. Termination of parental rights is a severe and terminal action, so the legislature has mandated that in order to terminate these rights, the state must satisfy an onerous burden of proof. Namely, it bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence. La. Ch.C. art. 1035; State in Interest of D.G. v. Danny G., 30,196 (La.App. 2d Cir. 10/29/97), 702 So.2d 43. Although there are seven statutory grounds for involuntary termination of parental rights set forth in La. Ch.C. art. 1015, only one ground need be established. State in Interest of SNW v. Mitchell, 01-2128 (La. 11/28/01), 800 So.2d 809; State in the Interest of D.G. v. Danny G., supra. Pursuant to the clear and convincing proof standard, the state must show that the parents' failure to comply with the enumerated condition is highly probable. State in Interest of B.H. v. A.H., supra. Once a ground for termination has been established, the judge may terminate parental rights if the termination is in the best interest of the child. La. Ch.C. art. 1039.
As relevant to this matter, La. Ch.C. art. 1015(5), includes the following grounds for termination of parental rights:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
La. Ch.C. art. 1036(C) provides that lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
In relevant part, La. Ch.C. art. 1036(D)(3) provides:
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
The state must prove that the parent is unfit to retain parental control and that there is no reasonable expectation of reformation in the foreseeable future in order to obtain termination of parental rights when the child has been removed from the parent's home. State in Interest of D. T. v. K. T., 29,796 (La. App. 2d Cir. 6/18/97), 697 So.2d 665. A reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated. Reformation means more than mere cooperation with agency authorities. More importantly, reformation of the parent is shown by a significant, substantial indication of reformation such as altering or modifying in a significant way the behavior which served as a basis for the state's removal of a child from the home. State in Interest of S.M., 98-0922 (La. 10/20/98), 719 So. 2d 445.
In this matter, the evidence submitted by the State in support of termination of the parental rights of J.T. included the testimony of the OCS caseworker, Janine Brown, Court-Appointed Special Advocate ("CASA") volunteer assigned to the case, Lea Bass, and J.M.T.
Janine Brown, the OCS foster care caseworker, was appointed to the case in January 2006. She confirmed that the children entered foster care on June 8, 2005. At the time of trial, Brown had observed the family for two years and concluded that neither J.T. nor J.M.T. had shown any improvement in their ability to parent the children. Brown testified that at the time of trial, C.R. was ten years old and C.T., the child of J.T. and J.M.T., was four years old.
Brown stated that the couple had a pattern of beginning the services provided, but then stopping and being combative. Although J.T. participated in three anger management classes, she failed to demonstrate any of the skills learned. For example, Brown recalled that after one of the anger management classes, J.T. put Brown out of her house during a visit. On cross-examination, Brown conceded that the two were able to visit that day after J.T. apologized. Since that time J.T. would only allow Brown at her home if she was accompanied with a third person. A separate incident occurred when Brown brought C.T. to visit her father (J.M.T.) in jail. J.T. was angry that all of the children were not with Brown and struck her hand. Brown also testified that J.T. had two criminal charges filed against her after initial anger management training. She recalled that one involved a domestic violence charge and the other involved J.T.'s ramming of another vehicle in a store parking lot. Brown gave no dates for the aforementioned events. Brown also recalled a mall incident in May 2007 where J.T. was escorted out of the mall by security for causing a scene in front of C.R.
J.T. had trouble maintaining stable employment. Brown described her employment history as sporadic. Although J.T. would pay some of her bills, Brown testified that she generally maintained outstanding balances. J.T.'s mother would help to pay for expenses. Brown testified that J.T. consistently tested negative on drug screening, although J.M.T. had positive tests and was arrested for obscenity and possession of cocaine in January 2007. According to Brown, J.T. never completed Al-Anon sessions which were part of her case plan.
In Brown's opinion, J.T. did not comply with her case plan. Referring to the requirements of the June 19, 2007 case plan,[2] Brown felt that J.T. did not learn from her anger management training. She did not maintain a job or income sufficient to meet the needs of her children and did not place the needs of her children above her own. Brown also stated that J.T. did not make herself available for scheduled visits and was not supportive of her children's placements with their grandparents. She did not believe reunification of the family was a safe option and that the children were in the best possible placement with their grandparents. Brown testified that it was J.T.'s intent to stay in her marriage with J.M.T.
Brown testified regarding the last scheduled family visit she attended with the family in December 2007. She described it as a "big party." She concluded that in her opinion there has been no improvement in J.T.'s ability to parent her children. Regarding J.T.'s future improvement, Brown could not predict the future and was "not sure about that." Brown testified that J.T. was available when the home visits were ultimately scheduled and that Brown was allowed in the home by J.T. She visited the home within the last two months before trial. It was not adequate for the children's return because there were "clothes and stuff' everywhere. Brown had not discussed with J.T. a lawsuit filed against J.T.'s home.
On cross-examination, Brown was presented with documentation entered into evidence by J.T. showing that J.T. had completed an anger management class in August 2006. Brown recalled that it was after this training that J.T. had been arrested. Brown also admitted that J.T. had completed twelve sessions of anger management training with Reverend David Campbell in June 2007 which were completed the week prior to the TPR petition being filed. Brown conceded that she never spoke with J.T. regarding what she learned in that anger management class and ultimately acknowledged that the allegations regarding J.T.'s failure to complete anger management classes in the TPR petition were not accurate. She testified that she had not seen any progress in J.T's ability to control her anger in the months immediately before trial, although she could not specify any events which led her to that conclusion.
Brown was also questioned regarding allegations in the June 18, 2007 TPR petition which stated that J.T. had not obtained psychological counseling. Brown was shown an October 6, 2006, OCS progress report authored by Sheila Green, J.T.'s counselor, (JT#3) which documented that J.T. had attended eighteen counseling sessions as of that date. Brown conceded that J.T. had participated in counseling and the TPR petition was wrong. The report issued by Green noted as follows:
I have continued to utilize a cognitive-behavioral approach combined with techniques from Reality Therapy, and I have seen some success recently.
* * *
[J] has shown some improvement since the last progress report. She is currently working. . . . She stated that she is starting to enjoy being independent and self-reliant and wants to continue to work. She appears to be more aware of how her actions and choices are affecting her life. She appears to be finding more appropriate ways of handling her anger and has even begun to so some self-evaluations of her behavior. This is positive if she continues because awareness of problems can sometimes be therapeutic.
* * *
Overall, [J] continues to experience chaos in her life, but has appeared to be handling it better during the past few weeks. The prognosis for [J]'s improvement remains guarded at this time, but could become more favorable if she continues to cooperate and actively apply the skills learned in the counsel sessions to her daily life.
Brown was also confronted with the TPR petition claims which alleged that J.T. had not completed a parenting program. She was shown documentation from May 1, 2007 (JT#4) which revealed that J.T. had completed 13 hours of parent group support sessions. Brown acknowledged the document as accurate. She also acknowledged that J.T. completed the classes in time for two scheduled visits with the children before the filing of the TPR petition. She could not recall what happened in those visits. Nevertheless, she testified that the mall incident in May 2007 showed that J.T. remained unable to demonstrate parenting skills because she upset C.R. rather than leaving the situation.
Brown was also confronted with allegations in the TPR petition which claimed that J.T. had not completed Al-Anon sessions. Brown was shown an October 10, 2006 letter from the primary counselor at the Bastrop Addictive Disorders Clinic which stated:
I have observed significant, positive changes in Ms. [T]'s attitude and a change of focus from things going on outside of her (over which she has no control) to focusing on what she can change about herself. This factor leads me to believe that she is attending Alanon (sic) Family Group sessions and finally getting support from people who have been where she's been. Prognosis for her continued recovery is, in my opinion, very good.
The Al-Anon attendance sheet showed that J.T. had consistently attended 25 Al-Anon meetings through May 21, 2007. Brown ultimately agreed that evidence showed that J.T. was attending Al-Anon meetings and that the TPR petition was false.
Brown conceded that J.T. had maintained an adequate and stable home for her children in accordance with the case plan. She also agreed that J.T. has sought to get employment to fulfill the plan requirement that she maintain adequate income to meet her needs and the needs of her children. Documentation submitted by the defense (JT#7) evidenced that J.T. was employed on January 6, 2008. Brown testified that J.T. appeared at all of the scheduled court hearings. Brown agreed that J.T.'s drug tests were negative.
Lea Bass, a CASA volunteer, also testified. Bass was involved with the family from June 2005 until April 2007. During that time, Bass had opportunities to visit the family and the parents during home visits or family conferences. At her first visit with the family, she was forced to call 911 for a domestic dispute between J.T. and J.M.T. After this incident, OCS supervised the visits that she attended. Bass observed a strong bond between the children and their parents, although certain of the parents' behavior concerned her. Bass testified that J.T. would question the children about their grandparents which made them uncomfortable. Bass also testified that it was CASA's recommendation that the children stay in the home of their grandparents because C.T. and C.R. had bonded well with them. She stated that she saw no improvement in the parents' lifestyle or their ability to care for their children. For example, Bass stated they were not able to maintain stable employment, had continued problems with the marriage and there existed drug use in the home. Bass admitted that J.T. had completed both parenting and anger management classes since she last saw her.
J.M.T., who was in jail at the time of trial, testified that he and J.T. were married on October 4, 2004. He is the biological father of C.T. but not C.R. J.M.T. testified that he and J.T. did not complete their first parenting class because the instructor did not show up at their home. J.M.T. admitted that he was arrested for possession of cocaine in January 2007. He was rearrested in July for failing to complete court-ordered rehabilitation and received a 22-month sentence. He was at J.T.'s home when he got arrested, but J.T. did not know he was there. He admitted the utilities had been turned off once. J.M.T. testified he never brought drugs into the home. Upon his anticipated release from prison in 2009, J.M.T.'s children will have been out of his home for four years. J.M.T. confirmed the problems between J.T. and Brown.
In J.M.T.'s opinion, J.T. has made progress. He believed she thinks things through after counseling and that little things do not seem to bother her as much. J.M.T. testified that J.T. is a good mother and that the children would be better off with her.
J.M.T. explained that on the day J.T. left the children alone, he was taking methamphetamine. He was at his cousin's nearby house and he and J.T. were estranged. J.T. found out he was in town and she followed him to Monroe, leaving the children at home. When J.M.T. asked about the children, J.T. told him that someone was taking care of them although she would not reveal who it was. C.T. told J.M.T. that a neighbor sat on the porch after J.T. left the home. J.M.T. admitted J.T. had left the children alone on another occasion in February 2005.
J.T. testified that she attended three anger management classes and completed one with Reverend Campbell as late as June 2007. J.T. testified that she had benefitted from anger management training. She testified that she is more likely to resolve conflicts without violence and that the counseling sessions she completed with Sheila Green helped her.
J.T. also testified that she attended two parenting classes. She did not complete the first because the leader did not show up for the class. J.T. testified that she completed a second class for which she received a certificate. J.T. believed that she could demonstrate what she learned in those classes in raising her children. J.T. testified she had been supportive of her children's placements but that C.R.'s grandparents did not want to have a relationship with her and would ignore the child when she was with them. The same was true regarding C.T.'s grandparents.
Regarding her relationship with Brown, and the incident at the jail in June 2006, J.T. testified that it was Brown who first pointed her finger at J.T. When she did so, J.T. hit Brown's hand away. J.T. believed this incident affected her relationship with Brown. J.T. stated that Brown would complain that she had not received receipts, verification of employment and check stubs from J.T. when J.T. had delivered them to her two weeks earlier.
J.T. explained her July 2006 arrest for disturbing the peace. She testified that on that day she needed a ride. Her sister arrived with an individual who had stolen J.T.'s vehicle and $500 from her. The two exchanged words and fought. Both were arrested. J.T. felt that it was selfdefense because the individual hit her first.
J.T. also attempted to explain a July 2006 arrest for trespassing and remaining on the premises. She testified that she went to a friend's house to talk to a male friend who was there. She was asked to leave the residence and she complied. However, prior to her leaving, law enforcement was dispatched and she was arrested. J.T. explained that those charges arose from a separate incident in which she was arrested for simple battery and reckless operation of a vehicle based upon allegations that she had attempted to run the owner of the home in the above scenario off of the road with her car. J.T. denied those facts and testified that the charges were later dropped.
On July 11, 2007, J.M.T. was arrested at J.T.'s home for possession of cocaine and a parole violation. J.T. claimed to be unaware of his presence in the home. J.T. also explained an incident in a mall in the summer of 2007. She testified she was in the mall when she encountered C.R. and her father's girlfriend. C.R. ran up to J.T. and J.T. asked where her grandparents were. The girlfriend requested that C.R. leave and then began yelling. Security was called and J.T. was asked to leave because security had obtained the other person's story first.
J.T. recalled that she missed only her October 2007 visit with her children because of confusion on her part. She did not recall that she had missed any other visits. Regarding her ability to maintain a stable and adequate home for the children, J.T. testified that she has lived in her home in Bastrop since June of 1996, although she resided at her mother's house at the time of trial because her home had been broken into. She still maintains her home, however, and had just started a new job. In J.T.'s home each girl has her own room and furniture. Two months prior to trial, J.T. filed bankruptcy but understands that she will be able to keep her house. At the time of trial, J.T. was thirty years old and employed. J.T. testified that she does her best to keep full-time employment. In 2004, J.T. pled guilty to conspiracy to manufacture drugs and completed two years of probation for the conviction in 2006. Since then, she has difficulty in finding an adequate paying job.
Regarding drug use in the home, J.T. testified that she does not use drugs, although she admitted using drugs two years prior to trial and while the children were in state custody. This admission was contrary to Brown's testimony regarding J.T.'s drug use. J.T. testified that her children were never exposed to drugs in the home. J.T. testified that she reported to Bastrop Alcohol and Drug Disorders Clinic and had an assessment done. Because Bastop had no Al-Anon programs, she had to attend meetings in Monroe. She no longer attends the meetings because she does not have a car and cannot travel to Monroe. J.T. estimated that she attended a total of twenty meetings. J.T. tries to attend Alcoholics Anonymous meetings at her mother's home which is located very close to her home in Bastrop.
J.T. testified that she tried her best to cooperate with Brown and she tried to make herself available for visits. She did request that Brown bring someone with her on the visits. J.T. denied that she refused OCS access to her home. J.T. testified that she loves her children and that she did not want her parental rights terminated.
On cross-examination, J.T. testified that she was unaware that she failed to complete her initial parenting class due to combative and hostile behavior. She testified that she was very familiar with her case plan which was amended in October 2006 to separate her case plan from J.M.T.'s case plan. J.T. testified that all of her criminal charges have been resolved except her abandonment charges. She currently visits J.M.T. in jail and could not say if she was going to remain married to him.
J.T.'s mother testified that J.T. has a good relationship with her children and that the children do better when they are at home with J.T. She did not believe that J.T. should lose her children and that J.T. has learned her lesson. J.T's sister also testified. She stated that J.T. had a close relationship with her children and that since her classes, J.T. is calmer and does not lose her temper as much.
Reverend David Campbell testified on behalf of J.T. He stated that J.T. received anger management training from him for a period of six to eight months. He rated her progress at seven or eight out of ten. Reverend Campbell was unaware of J.T.'s criminal arrests.
Documentation submitted by J.T. substantiates some improvement in J.T. by late 2006. The October 6, 2006 OCS progress report submitted to OCS by Sheila Green documents that J.T. had begun "to recognize a relationship between her actions and her outcomes." Specifically Green reported that J.T. "has shown some improvement since the last progress report." The report of October 10, 2006, from Douglas B. Kline, Primary Counselor for the State of Louisiana Department of Health and Hospitals, to Ms. Brown noted "significant, positive changes in [J.T.'s] attitude and a change of focus from things going on outside of her (over which she has no control) to focusing on what she can change about herself" Kline reported that "[p]rognosis for her continued recovery is, in my opinion, very good." It was in the two months after these reports that J.T. voluntarily completed a parenting class and participated in a third anger management class with Reverend Campbell. Documentation shows that J.T. also remained consistent in her Al-Anon attendance from October 2006 through May 2007.
Nevertheless, it was during the time she was receiving anger management counseling with Reverend Campbell that J.T. was escorted out of a mall on May 10, 2007, after an incident involving C.R.
The record is also clear that J.M.T. continues to be a source of angst for J.T. and her primary source of poor judgment. Both J.T. and J.M.T. admitted that J.M.T. was arrested in July 2007 in J.T.'s home, although both denied that she knew he was there. J.T. also admitted to obtaining gas money from Reverend Campbell in order to pick up J.M.T. in Lafayette. J.M.T. testified that it was between January and July 2007 that he worked in Lafayette for two weeks after he left a court-ordered drug rehabilitation program. At trial, J.T. could not state with certainty whether she was going to remain married to J.M.T. upon his release from prison.
At the time of the TPR hearing, J.T.'s children had been out of her home for almost three years. During that time, J.T. completed three anger management classes and a parenting class in accordance with her case plan. She also received counseling and completed required Al-Anon classes as required by her plan. Brown testified that with the exception of scheduling difficulties, J.T. made most of her planned visits with the children. Although Brown testified that J.T. maintained sporadic employment, she admitted that J.T. tried to work. J.T. was employed at the time of trial. Brown testified that J.T. maintained a drug free home in accordance with the plan. OCS's main concern were J.T.'s alleged failure to learn, discuss and practice what she had learned in both parenting classes and anger management and her confrontations with people outside of her family including Brown. Brown also expressed concern over J.T.'s ability to maintain a job and J.T's relationship with J.M.T.
Because of the high standard of proof necessary for the termination of parental rights, the inaccuracies and unsubstantiated conclusions that appeared in the State's case, and the vacillatory conduct of J.T., which has shown improvement at times, this is a very difficult case for this court. The substantive tests urged for the termination of J.T.'s parental rights are that she showed "no substantial parental compliance with a case plan" and has "no reasonable expectation of significant improvement" as a parent in the near future. La. Ch.C. art. 1015(5). OCS's sole reliance on the testimony of Brown and Bass without supporting expert testimony or the admission of evidence into the record is troubling. When questioned regarding the possibility of J.T.'s improvement in the future, Brown stated that she did not know. Brown believed that J.T. maintained a drug free home, while J.T. admitted to testing positive for drugs while her children were in state custody. The testimony of these witnesses relating to events which support the termination of parental rights was fractured and conclusory. OCS filed no reports into the record which may have clarified the testimony.
While it is apparent that J.T. has not become an ideal parent, and issues with her relationship with J.M.T. and her tendencies toward blame-shifting remain, from the evidence before this court, we cannot say that OCS has shown by clear and convincing evidence that J.T. has no reasonable expectation of significant improvement in the foreseeable future. We therefore reverse the portion of the judgment terminating J.T.'s parental rights of C.T. and C.R. and authorizing adoption. In all other respects the judgment is affirmed, specifically that portion which retains custody of the children in the Louisiana Department of Social Services pending further orders of the courts. Costs of this appeal in the amount of $120.00 are assessed against OCS in accordance with La. R.S. 13:5112.0
REVERSED IN PART; AFFIRMED IN PART; REMANDED.
NOTES
[1] J.M.T. has not appealed the termination of his parental rights to C.T.
[2] A final case plan was submitted to the Court on January 25, 2008.